

RECEIVED
Mail Room
AUG 24 2022
Angela D. Caesar, Clerk of Court
U.S. District Court, District of Columbia

# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| HAROLD E. RUTILA IV,<br><br>*Plaintiff,*<br><br>vs.<br><br>PETER P. BUTTIGIEG, SECRETARY OF THE DEPARTMENT OF TRANSPORTATION,<br><br>*Defendant.* | Civil Action No.<br>1:22-cv-00726-TSC<br><br>Assigned to the<br>Honorable Tanya S. Chutkan<br><br>**FIRST AMENDED COMPLAINT** |

Plaintiff Harold E. Rutila, IV, for his complaint against Defendant Peter Buttigieg, Secretary of the Department of Transportation, alleges as follows:

## INTRODUCTION

1. Plaintiff Harold E. Rutila, IV was an Air Traffic Control Specialist Trainee (ATCS) at the Department of Transportation, Federal Aviation Administration ("Defendant") from February 16, 2016 until his sudden termination on May 25, 2016.

2. Defendant's basis for terminating Rutila was underperformance, a conclusion drawn solely upon a score he received in merely one of a series of end-of-course performance assessments.

3. Defendant disregarded Rutila's documented contests, in which he stated that FAA Academy equipment malfunctions and evaluator error were the sole cause of the aforementioned performance assessment score.

4. Upon learning that female ATCS trainees, who had likewise been terminated on the same basis as Rutila, had been reinstated to the FAA Academy, Rutila sent a written request seeking reinstatement, which was ignored, and thereby, denied.

5. On July 11, 2016, Rutila exercised his right and obligation by filing an Equal Employment Opportunity Complaint with the FAA Office of Civil Rights.

6. As a member of one or more protected classes who has been subject to unlawful employment practices and decisions – including discrimination, failure to rehire, failure to reinstate, and failure to retrain –Rutila files suit against Defendant Pete Buttigieg for violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, (hereinafter "Title VII").

## PARTIES

7. Plaintiff Rutila is a resident of Detroit, Michigan and is a citizen of the United States.

8. Rutila was an employee of Defendant's from February 16, 2016 to May 25, 2016.

9. Rutila was employed as an Air Traffic Control Specialist Trainee with the Department of Transportation, Federal Aviation Administration, a federal civilian position which results in his categorization as a federal employee.

10. Rutila is a male.

11. Rutila is a "person" and "employee" as defined by Title VII.

12. Pete Buttigieg is the Secretary of Transportation and is being sued only in his official capacity.

## JURISDICTION AND VENUE

13. This Court has jurisdiction over the subject matter of this complaint pursuant to 28 U.S.C. § 1331, as this is an action arising under the laws of the United States, specifically Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*

14. This Court has jurisdiction over this action pursuant to the jurisdictional framework of Title VII, which provides that this case "may be brought" in

    a. "any judicial district in the State in which the unlawful employment practice is alleged to have been committed,"

    b. "in the judicial district in which the employment records relevant to such practice are maintained and administered," or

    c. "in the judicial district in which the aggrieved person would have worked but for the alleged unlawful employment practice," but

    d. "if the respondent is not found within any such district, such an action may be brought within the judicial district in which the respondent has his principal office."

    e. "For the purposes of sections 1404 and 1406 of title 28, the judicial district in which the respondent has his principal office shall in all cases be considered a district in which the action might have been brought."

    42 U.S.C. § 2000e-5(f)(3).

15. Defendant's principal office is located at 1200 New Jersey Ave, SE, Washington, D.C., 20590.

16. Defendant's relevant operating administration, the Federal Aviation Administration, has its principal office at 800 Independence Avenue, SW, Washington, D.C. 20591.

17. Rutila's documented duty location while employed with Defendant was Washington, D.C, *see* Exhibit 1 (Plaintiff's Notice of Personnel Action, Form SF-50), but was assigned to the FAA Academy in Oklahoma City, OK for the duration of his employment.

18. This Court has jurisdiction over this Title VII action, as Rutila has received notice of right to sue from the Equal Employment Opportunity Commission, has opted to, and did file this litigation within 90 days of receiving said notice.

## FACTS

### Background

19. Plaintiff Rutila is a commercial airline captain from Detroit, MI.

20. Rutila has been involved in aviation since 2007. He holds an FAA Airline Transport Pilot Certificate, Flight Instructor Certificate, and Gold Seal Instructor rating. Rutila completed a bachelor's degree in Aviation Management from Purdue University in 2014.

21. Immediately prior to the circumstances alleged herein, Rutila was self-employed, full-time, as a flight instructor with approximately 800 hours of flight experience and 3 years of instructing experience.

### Plaintiff's Hiring and Training

22. In 2015, Rutila was selected by the Federal Aviation Administration (FAA), to become an Air Traffic Control Specialist Trainee, FG-2152-01. His start date was February 16, 2016 at the FAA Academy in Oklahoma City, Oklahoma.

23. As is standard in this career field, Rutila was hired on a temporary appointment expiring May 26, 2016, upon which date he expected to graduate from the FAA Academy, be promoted to a full-time, permanent position, and be placed into an FAA field facility as a developmental Air Traffic Control Specialist.

24. Rutila underwent Defendant's Air Traffic Basics course from February 16, 2016 to March 21, 2016 as a prerequisite to begin Defendant's Initial Tower Training course.

25. Rutila underwent Initial Tower Training from April 6, 2016 until May 25, 2016.

26. Initial Tower Training concludes with a series of four end-of-course evaluations, called Performance Assessments (PAs), in computerized control tower simulators manufactured and supported at that time by a company called Adacel.

27. Defendant had experienced a number of ongoing problems with the Adacel equipment, and had documented some, but not all, such issues. *See* Exhibit 2.

28. On May 24, 2016, after having completed two out of four PAs, Rutila was deemed to have scored a 15% on his third PA, resulting in what Defendant terms "mathematical elimination," which it defines as the inability for a trainee to accumulate enough points from remaining assessments to achieve the 70% cumulative score required to pass the course. *See* Exhibit 3.

29. Following his third PA, Rutila disputed the operational integrity of Lab 5, the Adacel simulator he had been assigned for that PA, the correctness of actions taken by his evaluators therein, and that his evaluators' scoring did not account for the simulator's discrepancies. *See* Exhibit 4.

30. On May 25, 2016, Plaintiff Rutila was terminated by letter signed by J.B. Goelz of the FAA Onboarding and Placement Team (AJG-R43), issued to Plaintiff Rutila by Ken MacNeill of the Tower Training Branch (AMA-513).

31. On May 25, 2016, as attested by Plaintiff in his August 7, 2016 supplemental EEO affidavit, after having been informed of his impending termination, Plaintiff was speaking with two female classmates inside the FAA Academy, when an FAA Academy evaluator approached one of the females, Ashley Sanchez, and asked "Did you get enough points on that evaluation? I was really concerned for you." *See* Exhibit 5.

32. The evaluator who spoke to Ms. Sanchez was Michael MacDonald.

33. Ms. Sanchez passed with a 70.03% score, three hundredths above the termination threshold. *See* Exhibit 6.

### The FAA Academy

34. The FAA Academy views its scoring methodology as a reliable predictor of trainees' future success as Air Traffic Control Specialists.

35. At all times relevant herein, the manager of the FAA Academy Air Traffic Division (AMA-500) was Wayne Coley.

36. At all times relevant herein, the manager of the FAA Academy Quality Assurance Branch (AMA-505) was Alethia Futtrell.

37. At all times relevant herein, the manager of the FAA Onboarding and Placement Team (AJG-R43) was Rick Mitchell.

38. Prior to 2016, the FAA Academy had administered targeted retraining and retesting to all trainees whose performance in an end-of-course evaluation had been deemed unsatisfactory.

39. Prior to 2016, terminating a trainee on the basis of one evaluation performance was not FAA's standard practice.

### FAA Academy Manager Alethia Futtrell

40. In 2001, the television series Life 360 created a documentary entitled *Roots*, in which Alethia Futtrell was filmed and interviewed from inside her FAA Academy office[1].

41. During this documentary, scenes from the exterior and interior of the FAA Academy, including a well-known radar antenna rotating beside an oil pumpjack, air traffic control display screens, and Ms. Futtrell on the phone in her FAA Academy office, are displayed, as Ms. Futtrell explains that she "manages seasoned air traffic controllers."

42. Ms. Futtrell's current role is as manager of FAA Academy Quality Assurance (AMA-505), the office under which evaluators who conduct end-of-course PAs on FAA Academy

---

[1] *Roots* is publicly available online here: https://www.youtube.com/watch?v=cCet1TVz4AY

trainees are assigned. In other words, Ms. Futtrell is in charge of PAs and those who administer them.

43. During this documentary, Ms. Futtrell states, with a negative connotation, that she works in a "white male dominated field," (23:28) expressing her belief, also with negative connotation, index finger pointing up, that they employees "think they understand" (24:11) why she wears traditional African clothing on Tuesdays, but "don't…have a clue" and "have no idea." *See* Complaint at 6, fn. 1.

44. These statements indicate Ms. Futtrell has a personal animus against male FAA employees like Rutila, going so far as to suggest *what* they think, and characterizing their thoughts in a way which portrays them as mentally clueless. *See id.*

45. Ms. Futtrell carried her personal gripes against male employees with her into the FAA Academy, expressing her beliefs openly on public television, not as a private citizen, but as an official representative and manager for Defendant.

46. The full *Roots* documentary is available on Alethia Futtrell's YouTube channel, Alethia Futtrell. *See* Complaint at 6, fn. 1.

47. Ms. Futtrell has self-identified her custody and control of her channel by placing her personal phone number, complete with an Oklahoma City, OK area code, 405, in the public comment section of said video. *See* Exhibit 7.

**Futtrell Removes Targeted Retraining and Retesting Provisions**

48. Since before the year 2000, the FAA Academy had deemed "point-value grading" schemes for Air Traffic Control Specialist Trainees as "inadequate." *See* Exhibit 8.

49. For example, to "more closely mirror the field" and "give each student every opportunity to succeed," the FAA Academy employed a new grading methodology, discarding point-value

7.

grading in favor of an assessment to "determine if a student has demonstrated the fundamental skills and knowledge necessary to **begin** field [on-the-job training]." *See, e.g., id.* (emphasis added).

50. Immediately prior to the events of this case, Defendant, by way of Ms. Futtrell, revised the grading scheme so as to revert back to a point-value grading system. *See* Exhibit 9.

51. As part of this change, Defendant's policy requiring targeted retraining and retesting of trainees with unsatisfactory evaluation performance was deleted by Ms. Futtrell. *See id.*

52. Under the revised grading scheme developed by Ms. Futtrell and her associates, Defendant rearranged the weights given to certain phases of training in a point-value scheme which based a trainee's cumulative score on only three categories of training records:

| Test | Administering Office | Total Weight |
|---|---|---|
| Written block tests (5) | AMA-505 Quality Assurance | 5% |
| Cumulative written test (1) | AMA-505 Quality Assurance | 5% |
| Performance Assessment (4) | AMA-505 Quality Assurance | 90% |

*See, e.g.,* Exhibit 10.

53. Consequently, nearly the entirety of FAA Academy trainees' performance – 90% – was to be assessed in four, end-of-course PAs administered by Ms. Futtrell's office, AMA-505.

54. Of the 4 PAs, two were worth 30%, and the other two were worth 15%. *See id.*

55. Under this revised scheme, each trainee must have a cumulative score of 70% to pass.

56. A trainee like Rutila, who scored too low on just *one* of the PAs, would (and did) fail the FAA Academy because the new point-value scheme does not decipher outlier data among trainees' overall performance, indicating the scheme is wrought with inherent flaws affecting its objective reliability.

57. Conversely, a trainee like Ashley Sanchez, who scored a 66% and 44% on the two PAs of highest weight, managed to pass with a 70.02% cumulative score.

8.

58. Terminations like Rutila's, which occurred on the basis of "mathematical elimination," were effected with purposeful disregard for any other readily available data points about a trainee's performance in Initial Tower Training.

59. Other documents in Rutila's training file substantially mitigates, if not outright *negates*, the skewed mathematical conclusions of Ms. Futtrell's point-value system.

60. Defendants rely upon Rutila's score in the point-value system for its proposition that Rutila underperformed at the FAA Academy.

61. Ms. Futtrell's point-value scheme includes only data that her own office, AMA-505, creates and controls.

62. Each trainee, like Rutila, was trained by dozens of instructors from AMA-513, an office which Ms. Futtrell does not oversee.

63. AMA-513's federal and contract instructors, all of whom are FAA-certified Air Traffic Control Specialists, directly trained, observed, and mentored trainees like Rutila in the months preceding end-of-course PAs, writing their observations on approximately 100 forms per each trainee.

64. None of the documentation created by AMA-513 over the course of Rutila's progression through Initial Tower Training was factored into Ms. Futtrell's point-value grading scheme, despite that these records contain a much more accurate depiction of whether Rutila had acquired fundamental skills and the knowledge necessary to begin field training, something that Ms. Futtrell's point-value grading scheme does not measure.

65. The exclusion of AMA-513's records from Defendant's considerations to terminate, and later, not reinstate Rutila stems from Defendant's animus against male trainees like Rutila.

66. Ms. Futtrell's removal of the FAA Academy's targeted retraining and retesting provisions further solidified Defendant's pretext to afford only certain trainees – exclusively or disproportionally female – with the opportunity to be reinstated, or otherwise rehired, and retrained, in accordance with Defendant's discriminatory preferences.

67. On or about the same time as the implementation of Ms. Futtrell's point-grading scheme, FAA manager Rick Mitchell was granted exclusive, sweeping authority to receive, review, approve, and/or deny terminated trainees' requests to be reinstated. *See* Exhibit 11.

68. Upon receipt of such requests, Mr. Mitchell worked directly with Ms. Futtrell to "obtain information" about each trainee. *See* Exhibit 12.

69. There was no standard operating procedure or practice which standardized Mr. Mitchell's approach to reaching his reinstatement determinations. *See id.*

70. If Mr. Mitchell merely *wanted* to reinstate trainees, as he did many times – especially for female employees – he had unmitigated authority to do so. *See id.*

71. The majority of trainees reinstated after failing the FAA Academy were female.

### Plaintiff Learns About Female Reinstatements

72. Beginning June 16, 2016, Rutila learned that Defendant had either rehired or reinstated, and then retrained, several female Air Traffic Control Specialist Trainees whom had previously been deemed "mathematically eliminated" and terminated during their end-of-course PAs.

73. On or about June 16, 2016, Rutila was informed by a friend, Jill Klaren, the then-supervisor of FAA's Waterloo, Iowa Air Traffic Control Tower that a female employee from a recent class at the FAA Academy had been terminated on May 10, 2016 and had been subsequently reinstated. Ms. Klaren encouraged Rutila to pursue reinstatement.

74. Rutila identified the aforementioned female employee as Madeline Bostic.

75. Rutila then identified an additional instance of a terminated female trainee named Khristine Kolberga whom was, like Ms. Bostic, reinstated.

76. Defendant has admitted to reinstating 4 additional unidentified trainees, stating 2 were male, inferring that the other 2 were female.

77. Thus far, the total number of known female trainees who failed FAA Academy training and were reinstated is 4, whereas the total number of known male trainees who failed FAA Academy training and were reinstated is 2, demonstrating a basis to claim that Defendant has a discriminatory preference for female employees, and that the nexus between Defendant's termination of Rutila and failure to reinstate him is his gender.

78. Defendant has admitted that two male trainees known to Plaintiff as having failed and been reinstated were named Thomas Brautigam and Michael Keeling.

79. At the time of Mr. Brautigam's reinstatement, upon information and belief, his father, Todd Brautigam, was a management-level employee of the FAA's control tower at Minneapolis-St. Paul International Airport, suggesting that Brautigam's reinstatement may have been the result of nepotism. Even if it were not, Defendant's unexplained reinstatement of Brautigam does not absolve Defendant of liability for the claims raised herein. *See, e.g., Whitfield v. International Truck and Engine Corp.*, 755 F.3d 438, 444 (7th Cir. 2014) (holding the district court exceeded its discretion when it found the hiring of an African-American employee negated any inference that the employer did not hire a different African-American employee because of his race).

80. Defendant's known reinstatement of two male employees does not negate Plaintiff's claims that Defendant has a discriminatory preference for female employees. *See id.*

81. Because Rutila is male, he was not afforded the opportunity to be reinstated following his termination, as such opportunity is more often extended to female employees, in accordance with Defendant's discriminatory preference for females.

82. Plaintiff believes additional cases of female employees failing FAA Academy training and being reinstated will be brought to light in discovery.

**Plaintiff's Performance Exceeded That of Reinstated Female Employees**

83. Because Rutila and his comparators were all FAA Air Traffic Control Specialist Trainees ("trainees"), with the same occupational title, pay grade and step, work rules, supervisors, trainers, evaluators, and other managers, Rutila is similarly situated to Madeline Bostic, Ashley Sanchez, Khristine Kolberga, any other trainee named herein, and any other trainee whom will be named in the forthcoming litigation.

84. Rutila's training records are replete with overwhelmingly positive remarks by approximately a dozen or more FAA Academy instructors, who observed Plaintiff's performance in the same or similar simulators used in his PAs. *See, e.g.,* Exhibit 13.

85. Rutila's Initial Tower Training written test scores were 100%, 100%, 88.1%, 100%, and 100%. *See* Exhibit 10.

86. Rutila's cumulative course written exam score was 96.24%. *See id.*

87. Rutila's first PA score was 79%. *See id.*

88. Rutila's second PA score was 85%. *See id.*

89. Rutila's third PA score was 15%. *See id.*

90. Rutila was not permitted to take his fourth PA because he had been "mathematically eliminated" by his third PA score the day before it was scheduled. *See id.*

91. The total point deficiency by which Defendant reports Plaintiff failed his training curriculum was 4.36 points. *See id.*

92. The total point deficiency by which Defendant reports Madeline Bostic failed her training curriculum, available in public records, was 10.88 points. *See* Exhibit 14.

93. Madeline Bostic was reinstated to the FAA Academy despite a significantly worse score than Plaintiff's, by a factor of more than two, in her first attempt at Initial Tower Training.

94. All trainees known to Plaintiff, including Madeline Bostic, whom were afforded a reinstatement opportunity, successfully completed their second round of FAA Academy training and became permanent Air Traffic Control Specialists, an outcome Plaintiff reasonably expected when he requested reinstatement.

95. Considering that all trainees known to have been terminated and reinstated, as alleged herein, were terminated for identical reasons of "performance," there exists no basis upon which Defendant could allege, speculate, or otherwise claim that Plaintiff's success in subsequent training, had he been reinstated, would have resulted in an outcome opposite to those trainees. In other words, there is a strong inference Rutila would have likewise passed.

96. The only characteristic of Rutila's which prevents Defendant from reinstating Plaintiff is his male gender, which Defendant disfavors for employment over females.

97. Any reasonable person could conclude, based on Rutila's entire training record, as well as his personal and professional life, that Rutila would be a successful Air Traffic Control Specialist, but for Defendant's discriminatory actions against him.

### Plaintiff Timely Disputed Defendant's "Accepted Claim" Language

98. Beginning July 11, 2016, Rutila initiated timely informal and formal complaints of discrimination with the FAA Office of Civil Rights and DOT Departmental Office of Civil Rights (DOCR), respectively.

99. In determining how to handle Rutila's complaint, Mr. Mitchell conferred with Ms. Futtrell. *See* Exhibit 11.

100. Futtrell's insistence that Rutila lacked merit as a trainee, and Mitchell's implementation of her recommendations, is indicative of discriminatory policy and/or practice by Defendant, which enables Defendant to avoid hiring, retaining, or otherwise reinstating male employees over similarly-situated females, using their "performance" as pretext for sex-based discrimination.

101. On November 29, 2016 at 9:41 A.M., Plaintiff received Defendant's "accepted claim" letter, which contained the language Defendant used to define the scope of Defendant's investigation into his claims of gender-based discrimination[2]. *See* Exhibit 15.

102. On December 3, 2016 at 10:16 P.M., four days following his receipt of Defendant's "accepted claim" letter, Rutila timely objected to the "accepted claim" language via email to Defendant, stating "This is a request for correction regarding the accepted claim," seeking to ensure his contest of the reinstatement of Madeline Bostic, and Defendant's denial of Rutila's like request, was properly included within the "accepted claim." *See* Exhibit 17.

103. On December 5, 2016, Defendant responded that Rutila's request was "being reviewed by management," but never followed up or amended the "accepted claim." *See* Exhibit 18.

---

[2] In Defendant's words: "[T]he official accepted claim is the basis of the scope of the investigation." *See* Exhibit 16.

104. In the administrative proceedings, Defendant subsequently denied Rutila discovery on the issue of its reinstatement of female trainees on the basis that its "accepted claim," as written by *Defendant*, purportedly did not account for that issue. *See, e.g.*, Exhibit 19.

105. On March 28, 2017, Plaintiff's attorney questioned Defendant regarding its non-answer to Rutila's request to amend Defendant's "accepted claim," to which Defendant responded by stating "[A]dditional narrative **may not be added** to the accepted claim for investigation…," again denying Plaintiff's request. *See* Exhibit 16 (emphasis added).

106. On August 29, 2017, Rutila filed an appeal of DOCR's decision with the EEOC.

107. On July 10, 2020, the EEOC administrative judge committed clear error in finding "[C]omplainant was given five days in which to submit any objections to the manner in which his claim was framed, **which he did not do**. Any further objections are deemed waived." Exhibit 20 (emphasis added), *compare with* Complaint ¶¶ **Error! Reference source not found.**, 102.

108. On July 10, 2020, EEOC issued a decision containing right-to-appeal language.

109. On July 15, 2020, Defendant issued its Final Order incorporating EEOC's decision.

110. On July 28, 2020, Rutila filed an appeal of the EEOC decision with the EEOC Office of Federal Operations (OFO).

111. On December 16, 2021, Rutila received EEOC OFO's decision containing right-to-sue language.

112. EEOC OFO's decision did not address Plaintiff's contest to Defendant's improper framing of the scope of Defendant's "accepted claim" or its impact on discovery, raised by Plaintiff 22 times across 6 pages in his appeal of the EEOC AJ's decision.

113. By failing to amend the "accepted claim" upon request by Plaintiff, and subsequently by his attorney, Defendant is liable for any ensuing consequences of that inaction, which Rutila will seek to have remedied before this Court.

114. In considering its reinstatements of female trainees to be "outside the scope" of the claims at bar, *see, e.g.*, Complaint ¶ 104, Defendant is liable for any loss of evidence and witness testimony it failed to pursue while investigating Rutila's EEO claims.

### COUNT I: Title VII 42 U.S.C. § 2000e, *et seq.*

115. Plaintiff Rutila hereby incorporates the allegations set forth in the foregoing paragraphs as though fully alleged herein.

116. Plaintiff Rutila is a male.

117. Plaintiff Rutila's position as an Air Traffic Control Specialist Trainee, FG-2152-01, are and/or were civilian positions in the federal government.

118. Plaintiff Rutila's employer, the Department of Transportation, was to provide employment free from any discrimination on the basis of sex. 42 U.S.C. § 2000e *et seq*.

119. Pursuant to Title VII, it is unlawful for any employer to fail or refuse to hire or to discharge, or otherwise to discriminate against any individual on the basis of sex. 42 U.S.C. § 2000e *et seq*. The *McDonnell Douglas* framework was "not intended to be an inflexible rule." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S. Ct. 1338, 1353, 191 L. Ed. 2d 279 (2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 575, 98 S. Ct. 2943 (1978)).

120. A Plaintiff may establish a *prima facie* case of discrimination by "'showing actions taken by the employer from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were based on a discriminatory criterion illegal

under' Title VII." *Young v. United Parcel Serv., Inc.*, 575 U.S. 206, 135 S. Ct. 1338, 1353, 191 L. Ed. 2d 279 (2015) (quoting *Furnco Constr. Corp. v. Waters*, 438 U.S. 567, 577, 98 S. Ct. 2943 (1978)).

121. Plaintiff Rutila is a member of the protected class as he is a male.

122. Defendant's failure to afford Plaintiff the same opportunities as other similarly-situated females – retainment, rehiring, and/or reinstatement, and retraining – following his termination is an adverse employment decision and form of intentional, unlawful discrimination, which permanently injured Plaintiff Rutila's ability to compete for the Air Traffic Control Specialist position, and which thereby denied him the compensation, privileges, terms and/or conditions of employment associated with that position.

123. As a result of the intentional and unlawful discrimination to which Rutila has been subjected, he became unemployed for 5 months, and while employed now, despite his due diligence, he significantly lags in pay and benefits between his present career and that of an Air Traffic Control Specialist, to which he had highly aspired to achieve.

**PRAYER FOR RELIEF**

Wherefore, Plaintiff Harold E. Rutila, IV requests the following relief:

a. Trial by jury on all issues;

b. Reinstatement to the Air Traffic Control Specialist position;

c. Placement as an Air Traffic Control Specialist within 60 miles of his present location;

d. Compensatory damages;

e. Back pay;

f. Pre- and/or post-judgment interest at the maximum allowable rates at law;

g. Attorney's fees and costs; and

h. All other equitable relief available by statute or common law.

Plaintiff Rutila reiterates his demand for trial by jury on all issues so triable.

Respectfully submitted,

DATED: August 22, 2022

*[signature]*

Harold Edward Rutila IV
3800 Greenfield Rd #1958
Dearborn, MI 48120
h.rutila@gmail.com
(810) 845-3497
*Pro Se*

## CERTIFICATE OF SERVICE

On August 22, 2022, I sent a copy of the foregoing document to Defendant's counsel via email.

*[signature]*

Harold Edward Rutila IV
3800 Greenfield Rd #1958
Dearborn, MI 48120
h.rutila@gmail.com
(810) 845-3497
*Pro Se*