## Index of Exhibits

| # | Description |
|---|---|
| 1 | Rutila's SF-50 |
| 2 | 2016 Computer Discrepancy Log |
| 3 | Rutila's PA Forms from PA 3 |
| 4 | Rutila's Technical Review Forms from PA 3 |
| 5 | Rutila's Supplemental EEO Affidavit from August 7, 2016 |
| 6 | Class 99899 Score Sheet |
| 7 | Screenshot of Alethia Futtrell's Public Comments |
| 8 | FAA's 1998 Order Regarding Point-Value Scoring |
| 9 | Email from Alethia Futtrell Removing Retraining and Retesting Provisions |
| 10 | Rutila's Initial Tower Training Score Sheet |
| 11 | Excerpts from Deposition of Rick Mitchell on August 21, 2019 |
| 12 | Excerpts from Affidavit of Rick Mitchell on April 30, 2017 |
| 13 | Sample of Rutila's AMA-513 training records |
| 14 | Madeline Bostic's Initial Tower Training Score Sheet |
| 15 | USPS Confirmation of Receipt |
| 16 | Rutila's Attorney's Correspondence with DOCR regarding "accepted claim" |
| 17 | Rutila's Timely Contest to "Accepted Claim" Language |
| 18 | Defendant's Response to Rutila's Contest |
| 19 | Excerpt from Defendant's Objections to Discovery |
| 20 | Excerpt from Decision of EEOC Administrative Judge |

# EXHIBIT 1

Standard Form 50
Rev. 7/91
U.S. Office of Personnel Management
FPM Supp. 296-33, Subch. 4

## NOTIFICATION OF PERSONNEL ACTION

| 1. Name (Last, First, Middle) | 2. Social Security Number | 3. Date of Birth | 4. Effective Date |
|---|---|---|---|
| RUTILA IV, HAROLD E | | 06/03/1993 | 05/25/2016 |

| FIRST ACTION | | SECOND ACTION | |
|---|---|---|---|
| 5-A. Code 357 | 5-B. Nature of Action TERMINATION | 6-A. Code | 6-B. Nature of Action |
| 5-C. Code ZVB | 5-D. Legal Authority P.L. 104-50 | 6-C. Code | 6-D. Legal Authority |
| 5-E. Code | 5-F. Legal Authority | 6-E. Code | 6-F. Legal Authority |

| 7. FROM: Position Title and Number AIR TRAFFIC CONTROL SPEC.  AJT-ACMD T  AJTT28A | 15. TO: Position Title and Number |
|---|---|

| 8. Pay Plan | 9. Occ. Code | 10. Grade or Level | 11. Step or Rate | 12. Total Salary | 13. Pay Basis | 16. Pay Plan | 17. Occ. Code | 18. Grade or Level | 19. Step or Rate | 20. Total Salary/Award | 21. Pay Basis |
|---|---|---|---|---|---|---|---|---|---|---|---|
| FG | 2152 | 01 | 01 | 22888 | PA | | | | | | |

| 12A. Basic Pay | 12B. Locality Adj. | 12C. Adj. Basic Pay | 12D. Other Pay | 20A. Basic Pay | 20B. Locality Adj. | 20C. Adj. Basic Pay | 20D. Other Pay |
|---|---|---|---|---|---|---|---|
| 18343 | 4545 | 22888 | 0 | | | | |

| 14. Name and Location of Position's Organization OFFICE OF THE ADMINISTRATOR  CHIEF OPERATING OFFICER  VP, AIR TRAFFIC SERVICES  AT CENTRALIZED HIRING T  WASHINGTON,DC | 22. Name and Location of Position's Organization |
|---|---|

### EMPLOYEE DATA

| 23. Veterans Preference  1 – None    3 – 10-Point/Disability    5 – 10-Point/Other  2 – 5-Point    4 – 10-Point/Compensable    6 – 10-Point/Compensable/30%  I | 24. Tenure  0 – None    2 – Conditional  1 – Permanent    3 – Indefinite  3 | 25. Agency Use | 26. Veterans Preference for RIF  YES    X    NO |
|---|---|---|---|
| 27. FEGLI  C0    BASIC ONLY | 28. Annuitant Indicator  9    NOT APPLICABLE | | 29. Pay Rate Determinant  0 |
| 30. Retirement Plan  KF    FERS-FRAE & FICA | 31. Service Comp. Date (Leave)  02/16/2016 | 32. Work Schedule  F    FULL-TIME | 33. Part-Time Hours Per  Biweekly  Pay Period |

### POSITION DATA

| 34. Position Occupied  1 – Competitive Service    3 – SES General  2 – Excepted Service    4 – SES Career Reserved  2 | 35. FLSA Category  E – Exempt  N    N – Nonexempt | 36. Appropriation Code  0036230 | 37. Bargaining Unit Status  7777 |
|---|---|---|---|
| 38. Duty Station Code  11-0010-001 | 39. Duty Station (City – County – State or Overseas Location)  WASHINGTON,DISTRICT OF COLUMBIA | | |

| 40. Agency Data  FUNC CLS 00 | 41.  VET STAT X | 42.  EDUC LVL 13 | 43.  SUPV STAT 8 | 44.  POSITION SENSITIVITY MODERATE RISK |
|---|---|---|---|---|

45. Remarks
FORWARDING ADDRESS: 10900 S PENNSYLVANIA AVE APT 623 OKLAHOMA CITY OK
73170 4225
ATC POSITION NOT COVERED BY PL 92-297 FOR EARLY RETIREMENT PURPOSES
REASON(S) FOR TERMINATION: TERMINATION OF TERMPORARY APPOINTMENT
LUMP-SUM PAYMENT TO BE MADE FOR ANY UNUSED ANNUAL LEAVE, SF-8 ISSUED TO EMPLOYEE
SF 2819 WAS PROVIDED.  LIFE INSURANCE COVERAGE IS EXTENDED FOR 31 DAYS DURING WHICH YOU ARE ELIGIBLE TO
CONVERT TO AN INDIVIDUAL POLICY (NONGROUP CONTRACT).

| 46. Employing Department or Agency  TD - FAA | 50. Signature/Authentication and Title of Approving Official  161029609 / ELECTRONICALLY SIGNED BY:  ROBERT R BRYAN  HUMAN RESOURCES ASSISTANT |
|---|---|
| 47. Agency Code  TD03 | 48. Personnel Office ID  1675 | 49. Approval Date  05/27/2016 | |

5-Part 50-316                    2 - OPF Copy - Long-Term Record - DO NOT DESTROY

Editions Prior to 7/91 Are Not Usable After 6/30/93
NSN 7540 01-333-6238

This is an 'official' document generated from the eOPF system.

# EXHIBIT 2

## 2016 Computer Discrepancy Log

| DATE | RUN TIME | ELAPSED TIME | SCENARIO | POS | EVALUATOR(s)/INSTRUCTOR(s) | STUDENT(s) | PILOT(s) | IMPACT | DETAILS | RECORDER |
|---|---|---|---|---|---|---|---|---|---|---|
| 1/19/2016 | 12:55 | 0:34 | PV08 | LC | Henderson/Ward | Evaluator/Hobbs | Heitzman/Chin | 4 | LC Comm OTS, reset and scenario restarted | Henderson |
| 1/20/2016 | 11:15 | 7:34 | PV05 | ALL | Llamas | LC-Hink/GC-Evaluator | Hatfield/Roan | 3 | Restart | Henderson |
| 3/2/2016 | 12:55 | 2:00 | PV03 | LC-RPO | Henderson/Llamas | Sweeney/Minor | Wester/Heitzman | 4 | LC RPO comm OTS, reset and scenario restarted | Henderson |
| 3/3/2016 | 12:55 | 8:23 | PV08 | ALL | Henderson/Ward | Brown, H/Daniel-Hamburg | Thompson/Heitzman | 3 | Reset lab, restarted with scenario 7 | Henderson |
| 4/1/2016 | 11:15 | 3:00 | PV07 | LC | Anderson/Howard | Robinson/Trimble | Laminack/Hatfield | 4 | Excessive voice rec issues causing too much confusion for student and RPO. Restarted with same scenario. | Anderson |
| 4/15/2016 | 11:50 | 7:00 | PV02 | LC | Henderson/Taylor | Turner/O'Conner | Hatfield/Laminack | 3 | Comp error, Lab rebooted, Restarted with scenario 1 | Henderson |
| 4/18/2016 | 10:05 | 9:24 | PV08 | ALL | Howard/Llamas | Law/Bardsen | Heitzman/Chin | 3 | lost all comms @9:24, loaded PV01 | Howard |
| 5/3/2016 | 7:50 | 1:27 | PV01 | GC | Anderson/Ward | Johnson/Reich | Thompson/Wester | 7 | No comm on GC. Attempted reset/restart at failure point 3 times. Run cancelled and rescheduled for later in the same day. | Anderson |
| 5/3/2016 | 10:00 | 13:43 | PA04 | ALL | Taylor/Henderson | Gregory/Rapko | Laminack/Hatfield | 3 | UPS warning, Reset. -Restarted with scenario 3 | Taylor |
| 5/3/2016 | 8:55 | 1:05 | PA02 | ALL | Howell/McDonald | Reich/Cody | Roan/Heitzman | 4 | No Comms, change base and restarted | Taylor |
| 5/3/2016 | 11:05 | 21:32 | PA04 | ALL | Howard/McDonald | Reich/Cody | Roan/Heitzman | 7 | Lost Coms, rescheduled run | Taylor |
| 5/4/2016 | 11:45 | 17:00 | PV10 | ALL | Henderson/Taylor | Arthur/Fabrigas | Wester/Thompson | 3 | Comm failure, lab rebooted restarted with scenario 9 | Henderson |
| 5/16/2016 | 9:55 | 12:00 | PV11 | ALL | Henderson/Howard | Messepor/Schorder | Laminack/Hatfield | 3 | UPS warning, reset-Restarted with scenario 12/UPS replaced < run | Henderson |
| 5/25/2016 | 11:00 | 20:11 | PV03 | ALL | Henderson/Taylor | Gairens/Callender | Roan/Heitzman | 3 | Comm failure, lab rebooted, restarted with scenario 4 | Henderson |
| 6/18/2016 | 13:45 | 17:46 | PV12 | ALL | Henderson/Howard | Hall/Hernandez-Becerra | Laminack/Hatfield | 3 | PBS error, restarted with scenario 11 | Henderson |
| 6/30/2016 | 12:40 | 10:00 | PV11 | ALL | Anderson/Taylor | Richardson/Lubofsky-Ward | Estrada/Roan | 3 | Comm failure, Moved to Cab 4 and restarted with PV10 | Anderson |
| 7/1/2016 | 7:45 | 0:00 | PV08 | ALL | Henderson/McDonald | Durham/Spengler | Laminack/Thompson | 1 | RPO keyboard froze after students set up. Started same scenario | Henderson |
| 7/8/2016 | 14:00 | 22:00 | PV06 | ALL | McDonald/Taylor | Astillien/Campbell | Heitzman/Roan | 4 | Sub Error   Rescheduled Run | Taylor |
| | | | | | | | | | | |
| | | | | | | | | | | |

IMPACT KEY

1 = Minor - No impact, scenario never stopped/started
2 = Major - Restarted the scenario from failure point.
3 = Major - Restart with new scenario
4 = Major - Restart with same scenario.
5 = None - Scenario had reached the 30 minutes
6 = None - 30 minute training session was met.
7= Major - Reschedule Run

EXHIBIT 3

## Tower Cab Performance Assessment
## LOCAL CONTROL

2

| Name | Date | Scenario | Class Number | Evaluator Name | | |
|------|------|----------|--------------|----------------|---|---|
| RUTILA, HAROLD | 05/24/2016 | | 99899 | TAYLOR | | |

| | SUBJECT   Outcomes   •  Specific Outcome | Points | # of Errors | Total |
|---|---|---|---|---|
| | **ENSURE SEPARATION** | | | |
| | Collision | 16 | | |
| | **Runway separation not ensured** | | | |
| 1 | Arrival/Arrival | 16 | | |
| | Arrival/Departure | 16 | | |
| | Departure/Departure | 16 | | |
| | Aircraft arrival/departure and vehicle/taxiing aircraft | 16 | | |
| | **Departure separation not ensured** | | | |
| | Use of time or mileage for initial wake turbulence departure separation | 16 | | |
| | Intersection departure behind a heavy / B757/large/small+ | 16 | | |
| | Intersecting runway/flight path separation with a heavy or B757 | 16 | | |
| | Initial IFR departure separation   ASA 731   UAL 47 | 16 | 1 | 16 |
| 2 | **ISSUE SAFETY ALERTS** | | | |
| | Did not inform pilot when an unsafe situation had occurred/been observed | 16 | | |
| | Did not issue an a proper alternate course of action when it was feasible | 16 | | |
| 3 | **INITIATE REQUIRED COORDINATION** | | | |
| | Did not obtain a release for RWY 16 IFR departure | 10 | | |
| | Did not re-coordinate an expired IFR release off RWY 16 | 10 | | |
| | Did not coordinate/re-coordinate departure heading when required | 10 | | |

1

Exhibit F-10
Page 12
of 20

## Tower Cab Performance Assessment
### LOCAL CONTROL

| | | | |
|---|---|---|---|
| **Drop Tube** | | | |
| Departure strip not dropped after take-off clearance and before aircraft communications transfer | 5 | | |
| **IFR Missed Approach/ "GO AROUND"** | | | |
| Not coordinated with Departure | 5 | | |
| Not issued heading 020 and maintain 3000 | 5 | | |
| **Runway Crossing** | | | |
| Did not coordinate a runway crossing using established procedures /phraseology | 5 | | |

**4 — APPLY CONTROL JUDGMENT**

| | | | |
|---|---|---|---|
| Aircraft issued a "GO AROUND" because sequencing was not carefully planned  N9726E,  N4359Y | 3 | 1٦ | 6 |
| Aircraft issued unnecessary "go-around" (had > 2x minimum separation) | 3 | | |
| Approved a runway crossing resulting in an aircraft go-around | 3 | | |

**5 — APPLY PRIORITY OF DUTIES**

| | | | |
|---|---|---|---|
| Ignored aircraft calls on the same aircraft (each time after 2nd call) | 1 | | |

**6 — ESTABLISH EFFECTIVE TRAFFIC FLOW**

| | | | |
|---|---|---|---|
| Did not issue a pattern entry point | 5 | | |
| Did not effectively use the pattern legs to sequence and expedite traffic  N172P(2), N4359Y,  N3100S, N9726E(2) | 5 | ₥₥1 | 3Ø |
| Did not consider aircraft performance in making control decisions and allowed an aircraft to overtake a preceding aircraft | 5 | | |
| Aircraft delayed  (>5 minutes from when AC could have departed/crossed the runway (delay will also be counted for subsequent affected aircraft))  N 3Ø45Ø | 5 | 1 | 5 |

**7 — MAINTAIN AIRCRAFT IDENTITY**

| | | | |
|---|---|---|---|
| Issued control instructions to the wrong aircraft  N288PM, N535K5, 6704F N3100S | 3 | 1111 | 12 |
| Used "IDENT" or requested position report excessively   (each time after 2nd)  1 Deut | 3 then 1 ea | 1 | 3 |
| Did not maintain positive identity of aircraft (wrong call sign or type)  N3100S (3) | 1 | 111 | 3 |

Exhibit _F-10_
Page _13_
of _267_

## Tower Cab Performance Assessment
## LOCAL CONTROL

| | | | | |
|---|---|---|---|---|
| | **USE APPROVED STRIPMARKING** | | | |
| | **Departures** | | | |
| **8** | Block 9a – Record assigned heading if other than runway heading or departure procedure | 1 | | |
| | Block 17 – two-digit departure time in minutes | 1 | | |
| | **Arrivals** | | | |
| | Block 16 – Record MA for missed approach | 1 | | |
| | Block 17 – Two-digit arrival time in minutes | 1 | | |
| **9** | **ISSUE REQUIRED CLEARANCES** | | | |
| | Failed to issue landing or T&G clearance resulting in an aircraft go-around *(3-10-8)* <br> N31005, N4359Y | 3 | 1| | 4 |
| | Inappropriate use of "CLEARED FOR IMMEDIATE TAKEOFF" (Heavy) | 2 | | |
| **10** | **ADHERE TO LOAs/DIRECTIVES** | | | |
| | Did not comply with LOA's/SOP's/FAA Orders | 5 | | |
| | **Line Up and Wait (LUAW)** | | | |
| | Aircraft held on the runway too long   (> 2 minutes) | 1 | | |
| | Did not give reason for LUAW when it was not obvious | 1 | | |
| | Did not inform aircraft of the closest traffic on approach to the runway | 1 | | |
| | Had traffic holding in position with an aircraft cleared to land on the same runway | 3 | | |
| | Did not exchange traffic between LUAW aircraft on intersecting runway and traffic cleared to LUAW, depart or arrive an intersecting runway <br> N44L12 | 1 | 1 | 1 |
| | **Memory Aids** | | | |
| | Did not use LUAW memory aid | 1 | | |
| | Did not use runway crossing  visual aid | 2 | | |

Exhibit F-10
Page 14
of 269

# Tower Cab Performance Assessment
## LOCAL CONTROL

| | | | | |
|---|---|---|---|---|
| | **Issue Wake Turbulence Advisories to:** | | | |
| | Small landing behind a departing/arriving large aircraft on the same runway | 3 | | |
| | All aircraft landing behind a departing/arriving heavy jet/B757 on the same runway | 3 | | |
| | **Readback/Hearback** | | | |
| | Did not ensure accuracy of instructions/clearances read back by aircraft | 5 | | |
| | **Transfer Communication** | | | |
| | Did not transfer communications to Departure Control within Academy Tower's lateral surface area (excluding extensions) | 5 | | |
| | Transferred communication to GC prematurely (aircraft still between runways) | 5 | | |
| | **Anticipated Separation** | | | |
| | Did not advise aircraft of traffic to follow (No sequence) N6206F | 3 | 1 | 3 |
| | **Traffic Advisories** | | | |
| | Did not issue pertinent traffic (close proximity{within 1 mile}, converging, or potential conflict) | 5 | | |
| | **Arrival Information** | | | |
| | Did not ensure aircraft had arrival information | 3 | | |
| 11 | **USE STANDARD PHRASEOLOGY** | | | |
| | Did not identify position on initial contact | 1 | | |
| | Omitted "Heavy" from call sign | 1 | | |
| | Did not tell the aircraft to "HOLD SHORT OF RUNWAY 28R/28L/16" (1st call in proximity of runway) | 1 | | |
| | Did not use prescribed phraseology (i.e. approved procedures, words, phrases, or formats) | 1 | | |

TOTAL
85


Exhibit F-10
Page 15
of 207

## Tower Cab Performance Assessment
## LOCAL CONTROL

### SCORE

15

Evaluator Signature _____    Date _5/24/16_

This report has been discussed with me.

Student Signature __Harold E. Fields IV__    Date _05/24/2016_

Exhibit _F-10_
Page _16_
of _309_

5

EXHIBIT 4

TR IDENTIFIER:   HRUTILA-LC2 ( 1 )

| **Technical Review Panel Worksheet and Final Decision** | | | |
|---|---|---|---|
| **Student Name:** Harold Rutila | | **Date:** | 05/24/2016 |
| **Class #:** 99899 | | **Course #:** | 50046 |
| **Lead Instructor:** Shrabel, Wendell | | **Evaluator:** | Michael Taylor |
| **Panel Members :** | 1. Ronald Ward | | |
| | 2. Ken MacNeill | | |

**Summary of Student Claim:**

I was deducted points for use of the IDENT function. I specifically asked my leads, Wendell Shrabel and John Byrd, of the scoring criteria and was told that the use of IDENT was NOT limited on a per-scenario basis but rather on a per-aircraft basis. This was reinforced during training with several instructors, specifically Gayala, who instructed us to IDENT when the identity of the aircraft had not been ascertainable.

Complicating this matter was an errant VFR arrival who did not comply with pattern entry instructions, messing up the sequence I had established for the Runway 28L pattern, and which is the subject of a separate TR. Given the complexity this created in my scenario, I would not consider 3 IDENTs to be excessive.

**Panel Findings:**

The AAC ATCT Handbook includes a copy of the PA assessment form. The PA assessment form states that the third IDENT request is a 3 point deduction and each IDENT request after that is 1 additional point. This is also verbally briefed to the class during the Quality Assurance "Grading Guidelines" briefing.

**Final Decision:**

No points restored.

| | | |
|---|---|---|
| Panel Member 1 Signature | Panel Member 2 Signature | Student Signature |

TR IDENTIFIER: HRUTILA-LC2 ( 1 )

## Technical Review Intake Form

**SECTION 1**                    *(Student completes Sections 1-3)*

Student Name:   Harold Rutila          Date:        5/24/2016
Class #:        99899                  Course #:    50046
Lead Instructor:                       Evaluator:

Evaluation Scenario:  LC2

**SECTION 2 – Grade received today?**  ☒ Yes ☐ No

**SECTION 3 – Describe situation and provide reference**

Reference: FAA Order JO 7110.65W 3-1-9 "Use of Tower Radar Displays," paragraph b, subpar 1.

*Wendell Shrabel, John Byrd*

Situation: I was deducted points for use of the IDENT function. I specifically asked my leads, Wendell Shrabel and John Byrd, of the scoring criteria and was told that the use of IDENT was NOT limited on a per-scenario basis but rather on a per-aircraft basis. This was reinforced during training with several instructors, specifically Gayala, who instructed us to IDENT when the identity of the aircraft had not been ascertainable.

Complicating this matter was an errant VFR arrival who did not comply with pattern entry instructions, messing up the sequence I had established for the Runway 28L pattern, and which is the subject of a separate TR. Given the complexity this created in my scenario, I would not consider 3 IDENTs to be excessive.

**SECTION 4 – Does it meet criteria for Technical Review?**  ☒ Yes ☐ No (Explain)

_Harold E. Rutila IV_                        _DMS_
**Student Signature**                         **Manager Signature**

AMAFM 50031 1 [Rev 3, 4/25/2014] AMAWI 50031

TR IDENTIFIER:    **HRUTILA-LC2 ( 2 )**

| Technical Review Panel Worksheet and Final Decision | | | |
|---|---|---|---|
| **Student Name:** Harold Rutila | | **Date:** | 05/24/2016 |
| **Class #: 99899** | | **Course #:** | 50046 |
| **Lead Instructor:** Shrabel, Wendell | | **Evaluator:** | Michael Taylor |
| **Panel Members :** | 1. Ronald Ward | | |
| | 2. Ken MacNeill | | |

**Summary of Student Claim:**

I cleared an aircraft for an immediate departure from Runway 28L at Charlie. Traffic was a twin on over a one mile final. The aircraft proceeded onto the runway and did not continue its takeoff roll in the expeditious manner that had been demonstrated routinely in prior TSS scenarios. The aircraft had reported the traffic in final in sight and acknowledged the "immediate" instruction. Its failure to depart expeditiously led to a go around and point deductions.

**Panel Findings:**

After interviewing the evaluator and RPO, it was determined that the computer departed the aircraft at the appropriate speed for the takeoff clearance.

**Final Decision:**

No points restored.

| | | |
|---|---|---|
| Panel Member 1 Signature | Panel Member 2 Signature | Student Signature |

AMAFM-50031-2 (Rev 2, 4/1/2014) AMAWI-50031

TR IDENTIFIER: HRUTILA-LC2 ( 2 )

## Technical Review Intake Form

**SECTION 1**                    (Student completes Sections 1-3)

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 5/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | | **Evaluator:** | |

**Evaluation Scenario:** LC2

**SECTION 2 – Grade received today?** ☒ Yes ☐ No

**SECTION 3 – Describe situation and provide reference**
Reference: FAA Order JO 7110.65W 2-1-5 "Expeditious Compliance," par a.

Situation: I cleared an aircraft for an immediate departure from Runway 28L at Charlie. Traffic was a twin on over a one mile final. The aircraft proceeded onto the runway and did not continue its takeoff roll in the expeditious manner that had been demonstrated routinely in prior TSS scenarios. The aircraft had reported the traffic in final in sight and acknowledged the "immediate" instruction. Its failure to depart expeditiously led to a go around and point deductions.

**SECTION 4 – Does it meet criteria for Technical Review?**    ☒ Yes    ☐ No (Explain)

| | |
|---|---|
| *Student Signature* | *Manager Signature* |

AMAFM-50031-1 (Rev 3, 4/25/2014) AMAWI-50031

TR IDENTIFIER:   HRUTILA-LC2 ( 3 )

## Technical Review Panel Worksheet and Final Decision

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 05/24/2016 |
| **Class #:** 99899 | | **Course #:** | 50046 |
| **Lead Instructor:** | Shrabel, Wendell | **Evaluator:** | Michael Taylor |

| **Panel Members :** | |
|---|---|
| | 1. Ronald Ward |
| | 2. Ken MacNeill |

**Summary of Student Claim:**

I had an errant aircraft who did not comply with my multiple attempts to direct it into the Runway 28L traffic pattern. The aircraft departed the pattern unexpectedly, flew eastbound along the final approach course of Runway 28R in a nose-to-nose approach with an inbound airliner, flew north of the field and conducted several laps in the northern portion of the Class D airspace, then proceeded to exit the airspace, only to return to its northwest quadrant several minutes later. On its return to AAC Airport from the northwest, it crossed the departure corridor and required me to issue traffic to DAL461.

The aircraft had not made contact with the tower after re-entering the airspace. I had to conduct a "call out" to the aircraft, stating "Aircraft inbound from the northwest, say call sign." It was the SAME aircraft that had previously left the airspace. As far as I was concerned there is no reason this aircraft should have been expected to return into the scenario after exiting the north boundary of my CTRD coverage.

In accordance with the 7110.65W, I had the aircraft IDENT to ascertain its callsign before it departed north of the field. I also used the phraseology ADVISE INTENTIONS, in accordance with the P/CG, to determine what it was trying to do. The aircraft simply responded with "Full stop." This was not at all a helpful response, as I needed to figure out why the airplane went east and north rather than into the pattern, despite having proper readbacks of my pattern entry instructions. I received NO assistance from the RPO with this aircraft.

Never in 13 scenarios did I have an aircraft enter the north half of the AAC Delta unless specifically authorized for right traffic on Runway 28R. This aircraft was not so authorized.

Additionally, we had been informed by QA that from their standpoint, we could in theory allow aircraft to depart the Class D airspace, incurring only minor point deductions. Unfortunately, this aircraft's general flight path from the time it entered my pattern, overshot its final to its assigned runway, flew eastbound along the Runway 28R localizer OUTBOUND course, flying outbound to the north, then returning inbound from the northwest, resulted in SEVERAL additional transmissions that disabled my ability to handle other priorities in the scenario. It was NOT my intention to allow him to depart the airspace, but I had no other options once he did.

This aircraft created a massive chain of events that resulted in my inability to maintain control of the scenario and demonstrate the skills I have been taught up to this point. It is my opinion that this aircraft should have been removed, as was customary for errant aircraft during our TSS practice scenarios. OR tha

**Panel Findings:**

After talking with both the RPO and Evaluator from this scenario we determined that:  The simulator did its best to fly the aircraft in question (PA34, N4359Y) it instructed it.  The simulator responded appropriately with "Full Stop" when you asked "say intentions" for this aircraft.  The RPO performed their job appropriately. The RPO is not supposed to "Help", they are supposed to ensure the simulator moves the aircraft as per your instructions and that the simulator responds correctly to you.

**Final Decision:**

No points restored

| | | |
|---|---|---|
| **Panel Member 1 Signature** | **Panel Member 2 Signature** | **Student Signature** |

TR IDENTIFIER: HRUTILA-LC2 ( 3 )

**Technical Review Intake Form**

### SECTION 1 — (Student completes Sections 1-3)

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 5/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | | **Evaluator:** | |

Evaluation Scenario: LC2

### SECTION 2 - Grade received today? ☒ Yes ☐ No

### SECTION 3 - Describe situation and provide reference

Reference: AAC ATCT Handbook pp. 8-10 through 8-11, "Local Control Arrival"
FAA Pilot/Controller Glossary "Advise Intentions"
QA briefing
Lead Instructor, Wendell Shrabel
A-Lead Instructor, John Byrd

Situation: I had an errant aircraft who did not comply with my multiple attempts to direct it into the Runway 28L traffic pattern. The aircraft departed the pattern unexpectedly, flew eastbound along the final approach course of Runway 28R in a nose-to-nose approach with an inbound airliner, flew north of the field and conducted several laps in the northern portion of the Class D airspace, then proceeded to exit the airspace, only to return to its northwest quadrant several minutes later. On its return to AAC Airport from the northwest, it crossed the departure corridor and required me to issue traffic to DAL461.

The aircraft had not made contact with the tower after re-entering the airspace. I had to conduct a "call out" to the aircraft, stating "Aircraft inbound from the northwest, say call sign." It was the SAME aircraft that had previously left the airspace. As far as I was concerned there is no reason this aircraft should have been expected to return into the scenario after exiting the north boundary of my CTRD coverage.

In accordance with the 7110.65W, I had the aircraft IDENT its callsign before it departed north of the field. I also used the phraseology ADVISE INTENTIONS, in accordance with the P/CG, to determine what it was trying to do. The aircraft simply responded with "Full stop." This was not at all a helpful response, as I needed to figure out why the airplane went east and north rather than into the pattern, despite having proper readbacks of my pattern entry instructions. I received NO assistance from the RPO with this aircraft.

Never in 13 scenarios did I have an aircraft enter the north half of the AAC Delta unless specifically authorized for right traffic on Runway 28R. This aircraft was not so authorized.

Additionally, we had been informed by QA that from their standpoint, we could in theory allow aircraft to depart the Class D airspace, incurring only minor point deductions. Unfortunately, this aircraft's general flight path from the time it entered my pattern, overshot its final to its assigned runway, flew eastbound along the Runway 28R localizer OUTBOUND course, flying outbound to the north, then returning inbound from the northwest, resulted in SEVERAL additional transmissions that disabled my ability to handle other priorities in the scenario. It was NOT my intention to allow him to depart the airspace, but I had no other options once he did.

This aircraft created a massive chain of events that resulted in my inability to maintain control of the scenario and demonstrate the skills I have been taught up to this point. It is my opinion that this aircraft should have been removed, as was customary for errant aircraft during our TSS practice scenarios. OR that more information should have been provided to me about this aircraft when it began making non-standard, never-before-seen maneuvers throughout my airspace.

Our lead and A-lead instructors taught us to speak loudly toward the projection screens with "SAY INTENTIONS" and to expect a reply from the RPO. No such reply was given. HR

### SECTION 4 - Does it meet criteria for Technical Review? ☒ Yes ☐ No (Explain)

_(signature)_ Harold E. Rutila IV
**Student Signature**

_(signature)_
**Manager Signature**

TR IDENTIFIER: HRUTILA-LC2 ( 4 )

## Technical Review Intake Form

**SECTION 1**                    *(Student completes Sections 1-3)*

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 05/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | Shrabel, Wendell | **Evaluator:** | Michael Taylor |

**Evaluation Scenario:** LC2

**SECTION 2 - Grade received today?** ☒ Yes ☐ No

**SECTION 3 - Describe situation and provide reference**
Reference: FAA Order JO 7110.65W 3-9-4 "Line Up and Wait"

Situation: I was deducted points for failure to issue "Traffic holding in position Runway 16" to an aircraft conducting a touch-and-go on Runway 28L, who had been in the left pattern for that runway. In actuality, I never lined the aircraft up on Runway 16. I ensured the pattern traffic was no factor for the Runway 16 departure, and launched him on a departure-assigned runway heading. His takeoff clearance began at the Runway 16 hold short line.

Instead, I had lined up an airliner on Runway 28R and informed him of the traffic departing on Runway 16. Additionally, I informed the departing aircraft on Runway 16 of the traffic holding in position on Runway 28R. As far as I am aware, I complied with all procedures related to exchange of traffic information in this regard.

FOR MANAGEMENT USE ONLY

**SECTION 4 - Does it meet criteria for Technical Review?**  ☐ Yes  ☒ No (Explain)

I determined that this is an Evaluator observation vs. Student observation and therefore a NON-TR

_Student Signature_                                    _Manager Signature_

AMAFM-50031-1 (Rev 3, 4/25/2014) AMAWI-50031

TR IDENTIFIER: HRUTILA-LC2 ( 4 )

## Technical Review Intake Form

**SECTION 1**                    (Student completes Sections 1-3)

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 5/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | | **Evaluator:** | |

**Evaluation Scenario:** LC2

**SECTION 2 - Grade received today?** ☒ Yes ☐ No

**SECTION 3 - Describe situation and provide reference**
Reference: FAA Order JO 7110.65W 3-9-4 "Line Up and Wait"

Situation: I was deducted points for failure to issue "Traffic holding in position Runway 16" to an aircraft conducting a touch-and-go on Runway 28L, who had been in the left pattern for that runway. In actuality, I never lined the aircraft up on Runway 16. I ensured the pattern traffic was no factor for the Runway 16 departure, and launched him on a departure-assigned runway heading. His takeoff clearance began at the Runway 16 hold short line.

Instead, I had lined up an airliner on Runway 28R and informed him of the traffic departing on Runway 16. Additionally, I informed the departing aircraft on Runway 16 of the traffic holding in position Runway 28R. As far as I am aware, I complied with all procedures related to exchange of traffic information in this regard.

FOR IAS/ASS TC INTAKE ONLY

**SECTION 4 - Does it meet criteria for Technical Review?** ☒ Yes ☐ No (Explain)

| | |
|---|---|
| *Harold E Rutila II* | *(signature)* |
| **Student Signature** | **Manager Signature** |

AMAFM 50031 1 (Rev 3, 4/25/2014) AMAWI-50031

TR IDENTIFIER: HRUTILA-LC2 ( 5 )

| Technical Review Intake Form | | |
|---|---|---|

**SECTION 1**        *(Student completes Sections 1-3)*

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 05/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | Shrabel, Wendell | **Evaluator:** | Michael Taylor |

**Evaluation Scenario:** LC2

**SECTION 2 - Grade received today?** ☒ Yes ☐ No

**SECTION 3 - Describe situation and provide reference**
Reference: Pad from LC2 scenario
3-10-1 "Landing Information"

Situation: I was deducted points for failure to maintain identity of N310DS, who the examiner claimed was an errant aircraft, who is also the subject of a separate TR. N310DS, a Cessna 310, was not northwest of the airport as the examiner repeatedly indicated. I was familiar with the position of the aircraft to the extent that I knew he was NOT the aircraft that had departed (and then returned) from the northwest. The aircraft inbound from the northwest was Seneca 9726Z, NOT Twin Cessna 310DS.

FOR MANAGEMENT USE ONLY

**SECTION 4 - Does it meet criteria for Technical Review?** ☐ Yes ☒ No (Explain)

After talking with the Evaluator we determined that: The evaluator was looking at the RPO's monitor and knew exactly where the aircraft in question was located.
This is Evaluator observation vs. Student observation and therefore a NON-TR

| | |
|---|---|
| *Student Signature* | *Manager Signature* |

AMAFM-50031 1 (Rev 3, 4/25/2014) AMAWI-50031

TR IDENTIFIER: HRUTILA-LC2 ( 5 )

## Technical Review Intake Form

**SECTION 1**                    *(Student completes Sections 1-3)*

Student Name:  Harold Rutila          Date:        5/24/2016
Class #:       99899                  Course #:    50046
Lead Instructor:                      Evaluator:

Evaluation Scenario:  LC2

**SECTION 2 - Grade received today?** ☒ Yes ☐ No

**SECTION 3 - Describe situation and provide reference**
Reference: Pad from LC2 scenario
3-10-1 "Landing Information"

Situation: I was deducted points for failure to maintain identity of N310DS, who the examiner claimed was an errant aircraft, who is also the subject of a separate TR. N310DS, a Cessna 310, was not northwest of the airport as the examiner repeatedly indicated. I was familiar with the position of the aircraft to the extent that I knew he was NOT the aircraft that had departed (and then returned) from the northwest. The aircraft inbound from the northwest was Seneca 9726Z, NOT Twin Cessna 310DS.

**SECTION 4 - Does it meet criteria for Technical Review?**  ☒ Yes   ☐ No (Explain)

_Harold E. Riddle IV_                          _(signature)_
**Student Signature**                          **Manager Signature**

AMAIM 50031 1 (Rev 3, 4/25/2014) AMAWI 50031

TR IDENTIFIER:  **HRUTILA-LC2 ( 6 )**

| **Technical Review Panel Worksheet and Final Decision** | | | |
|---|---|---|---|
| **Student Name:** Harold Rutila | | **Date:** | 05/24/2016 |
| **Class #:** 99899 | | **Course #:** | 50046 |
| **Lead Instructor:** Shrabel, Wendell | | **Evaluator:** | Michael Taylor |

| **Panel Members :** | 1. Ronald Ward |
|---|---|
| | 2. Ken MacNeill |

**Summary of Student Claim:**

I was deducted points for addressing N310DS as "Cessna 310DS" rather than "Twin Cessna 310DS". As far as the 7110.65W is concerned, namely Section 2-4-20, "Aircraft Identification," this is not a violation of any rule.

"...Identify aircraft as follows:

a. U.S. registry aircraft. State one of the following:

...

1. Civil. ... The controller may state the aircraft type, the model, the manufacturer's name, followed by the ICAO phonetic pronunciation of the numbers/letters of the aircraft registration if used by the pilot on the initial or subsequent call."

The type of aircraft is a Cessna. Insofar as the 7110.65W is concerned, addressing a C310 as "Cessna" is permissable. Nowhere within the order does the term "Twin Cessna" appear.

The model of aircraft is a "three-ten," which is not an appropriate prefix to a callsign containing digits. Therefore it is not used, nor are examples provided where it or any other aircraft type described with numbers (Cirrus SR22, Diamond DA20, etc.).

Additionally, the order specifies how to describe aircraft in 2-4-21 "Description of Aircraft Types."

"...describe aircraft as follows when issuing traffic information.

...

c. General Aviation

1. Manufacturer's model or type designator.

**Panel Findings:**

After talking with the RPO and the Evaluator we determined that: this situation was evaluated correctly.

**Final Decision:**

No points restored

| | | |
|---|---|---|
| _(signature)_ | _(signature)_ | _(signature)_ |
| **Panel Member 1 Signature** | **Panel Member 2 Signature** | **Student Signature** |

AMAFM-50031-2 (Rev 2, 4/1/2014) AMAWI-50031

TR IDENTIFIER: HRUTILA-LC2 ( 6 )

## Technical Review Intake Form

**SECTION 1**                    (Student completes Sections 1-3)

| | | | |
|---|---|---|---|
| **Student Name:** | Harold Rutila | **Date:** | 5/24/2016 |
| **Class #:** | 99899 | **Course #:** | 50046 |
| **Lead Instructor:** | | **Evaluator:** | |

**Evaluation Scenario:** LC2

**SECTION 2 - Grade received today?** ☒ Yes ☐ No

**SECTION 3 - Describe situation and provide reference**

Reference: FAA Order 7110.65W 2-4-20 "Aircraft Identification"
FAA Order 2-4-21 "Description of Aircraft Types"

Situation: I was deducted points for addressing N310DS as "Cessna 310DS" rather than "Twin Cessna 310DS." As far as the 7110.65W is concerned, namely Section 2-4-20, "Aircraft Identification," this is not a violation of any rule.

"...Identify aircraft as follows:

a. U.S. registry aircraft. State one of the following:

1. Civil. ... The controller may state the aircraft type, the model, the manufacturer's name, followed by the ICAO phonetic pronunciation of the numbers/letters of the aircraft registration if used by the pilot on the initial or subsequent call."

The type of aircraft is a Cessna. Insofar as the 7110.65W is concerned, addressing a C310 as "Cessna" is permissible. Nowhere within the order does the term "Twin Cessna" appear. *Also note that we are not required to call an AC68 a "twin commander" despite that*

The model of aircraft is a "three-ten," which is not an appropriate prefix to a callsign containing digits. Therefore it is not used, nor are examples provided where it or any other aircraft type described with numbers (Cirrus SR22, Diamond DA20, etc.).

Additionally, the order specifies how to describe aircraft in 2-4-21 "Description of Aircraft Types."

"...describe aircraft as follows when issuing traffic information.                    *a single-engine Commander exists.*

...

c. General Aviation

1. Manufacturer's model or type designator.

2. Manufacturer's name, or add color when considered advantageous.

EXAMPLE -

...

'Cessna Four-Oh-One'
"

Note that in the example given, a C401 is called a "Cessna Four-Oh-One" and not a "Twin Cessna."

Note that the order specifies color may be added when considered advantageous. Nowhere within the order does it state that the word "Twin" may be added if considered advantageous. Since we exercise positive control of the pattern and cannot instruct aircraft to follow one another, oftentimes it is not ne

## FOR MANAGEMENT USE ONLY

**SECTION 4 - Does it meet criteria for Technical Review?**    ☒ Yes    ☐ No (Explain)

| | |
|---|---|
| _Harold E. Rutila_ | _[signature]_ |
| **Student Signature** | **Manager Signature** |

EXHIBIT 5

## COMPLAINANT SUPPLEMENTAL AFFIDAVIT

**Date**: 07 August 2016
**RE**: Case #2016-26956- FAA, Complainant Harold E. Rutila IV

The following is a supplemental affidavit regarding the complaint submitted in Case #2016-26956-FAA. It contains additional information pertaining to my claim of sex-based discrimination.

On May 25th, 2016, after Mr. MacNeill had advised me I would be terminated, he was not ready to begin termination proceedings. I was still permitted to freely walk about the facility and interact with others.

During the early afternoon, I was speaking with a co-worker, Dana Hodgson, and another co-worker, Ashley Sanchez, in the atrium. We were congratulating Ms. Sanchez, whom had just informed us that she had barely passed her evaluation, allowing her to continue her career with the agency.

Ms. Sanchez was a poor performer in our Tower Cab Initial Qualification Training course. She did not perform well on written tests, struggled during on-the-job training, and routinely expressed her doubts about her abilities to perform the job of an air traffic controller in class.

In the middle of our conversation, Ms. Sanchez's evaluator from her most recent evaluation approached Ms. Sanchez, Ms. Hodgson, and me. He interrupted our group conversation, and while looking at Ms. Sanchez, kindly asked her "Did you get enough points on that evaluation (to pass the academy)? I was really concerned for you."

Ms. Sanchez exchanged some kind words with him while Ms. Hodgson and I approached Ryan Callender, another co-worker from our class. Shocked, I told Mr. Callender exactly what I had just heard Ms. Sanchez's evaluator ask.

Ms. Sanchez's evaluator would have had no reason to believe Ms. Hodgson and I had washed out. We were still wearing FAA credentials. We were not displaying any emotions indicative of our recent failure. In fact, Ms. Hodgson and I were very happy for her success.

The evaluator's statement was a blatant indicator that I had been subjected to disparate treatment. First, the evaluation score sheet (entitled Tower Cab Performance Assessment) listed 55 graded items with an average worth of 5.87 points each, with many worth as high as 10 or 16 points. I needed 4.36 points to continue my employment. This means a *single* instance where my evaluators decided to withhold deducting a point for *any* of the 55 items on the grade sheet would have, on average, resulted in my retaining 5.87 points – 1.51 points more than the amount I needed to continue my employment.

Next, the evaluator's comment highlighted his "concern" for Ms. Sanchez's ability to pass the FAA Academy. He very likely allowed that concern to impact his grading methodology. If it was strong enough to cause him to verbally express this *after* the evaluation had taken place, it must have been strong enough to affect him *during* the evaluation itself. Above all, it suggests that Ms. Sanchez was indeed granted an unfair advantage during her evaluation.

Ms. Sanchez passed the FAA Academy with a 70.20%, barely above the passing threshold of 70%. The difference between my score 65.64% and her score was 4.56 points. Merely *one* decision by Ms. Sanchez's evaluator to refrain from deducting her points from among the 55 graded items may very well have allowed her to reach the 70% passing threshold. That is a *conservative* estimate as to how many

decisions like this Ms. Sanchez's evaluator may have made. Had he made multiple such decisions, Ms. Sanchez could have received an advantage worth double-digit point values very easily.

For any evaluation to be legitimate, the evaluator must be an impartial party. Ms. Sanchez's evaluator should not have been concerned about her overall score to begin with. Outside of evaluations themselves, evaluators and trainees have no one-on-one contact; at least, that's the way it's supposed to be.

The FAA's Aviation Instructor's Handbook, p. 5-3, contains the following paragraph concerning the objectivity of assessments:

> "The effective assessment is objective, and focused on student performance. It should not reflect the personal opinions, likes, dislikes, or biases of the [evaluator]. [Evaluators] must not permit judgment of student performance to be influenced by their personal views of the student, favorable or unfavorable. Sympathy or over-identification with a student, to such a degree that it influences objectivity, is known as 'halo error.' A conflict of personalities can also distort an opinion. If an assessment is to be objective, it must be honest; it must be based on the performance as it was, not as it could have been."

The fact that Ms. Sanchez's evaluator knew she had been struggling, evidently *before* her evaluation even began (e.g. "I was really concerned for you"), is extremely troubling. It suggests that agency officials made a decision to boost the overall score of a poorly-performing female trainee, Ms. Sanchez, so that she could pass the FAA Academy, following a willful decision to destroy the consistent success of an undeniably proficient male trainee, Mr. Rutila (me), so that I would fail the FAA Academy.

A clear example demonstrating their willful decision to tear down my success is the total lack of concern by the FAA Academy evaluation team and my supervisors when:

(1) they showed no concern that I was subjected to a fundamentally flawed evaluation that prohibited me from demonstrating my skills under normal, objective, realistic circumstances;

(2) they showed no concern that the evaluator and RPO were distractingly conversing for the entire 10 minutes wherein which the problems during the evaluation happened, despite that this was witnessed by three other people including my co-worker Andy Koski, another evaluator, and another RPO; and

(3) they showed no concern when I brought the issues described in (1) and (2) to their attention.

The FAA could not have cared less about the unusual circumstances which caused me to be unable to perform as I had consistently performed during training *and* two prior evaluations. Contrarily, Ms. Sanchez received care and concern for her performance, despite her already poor performance records.

**DECLARATION**

I, the undersigned, hereby declare under penalty of perjury that the statement I made above is true to the best of my knowledge, information, and belief.

| | | |
|---|---|---|
| _Harold E. Rutila IV_ | _Harold E. Rutila IV_ | _08/07/2016_ |
| Signature | Printed Name | Date |

EXHIBIT 6

# FAA Academy

# Initial Tower Cab Training- Class Score Book

| | |
|---|---|
| Start Date: | 4/4/2016 |
| End Date: | 5/25/2016 |

Course Number: 50046
Class Number: 99000

Students Enrolled: 14
Students Passed: 11

Ver.1 04/27/2016

**Tests and Performance Assessment**

| Status | Student Name (Post-class as Last) | Fld/Svc Area | Block Test 1-1 Raw Score | Block Test 1-1 Pellet Value | Block Test 2-1 Raw Score | Block Test 2-1 Pellet Value | Block Test 3-1 Raw Score | Block Test 3-1 Pellet Value | Block Test 4-1 Raw Score | Block Test 4-1 Pellet Value | Block Test 5-1 Raw Score | Block Test 5-1 Pellet Value | Comp Test-5 Raw Score | Comp Test-5 Pellet Value | Comp Test Comp Score | PA Run 1 Raw Score | PA Run 1 Point Value | PA Run 1 PSH | PA Run 2 Raw Score | PA Run 2 Point Value | PA Run 2 PSH | PA Run 3 Raw Score | PA Run 3 Point Value | PA Run 3 PSH | PA Run 4 Raw Score | PA Run 4 Point Value | PA Run 4 PSH | Points Accrued | Points Required to Pass | Points Available | Result |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| A | Kendrick Bryan | I/TT | 88.25 | 0.8621 | 87.50 | 0.8750 | 85.33 | 0.8333 | 86.36 | 0.8636 | 87.50 | 0.8750 | 84.32 | 4.4560 | 88.26 | 29.70 | 15.00 | G1 | 30.00 | 15.00 | G1 | 30.00 | 15.00 | G2 | 14.15 | 5.95 | G3 | 87.70 | | 0.00 | PASS |
| A | Anthony DeCroix | I/TT | 82.76 | 0.8276 | 95.83 | 0.9583 | 95.10 | 0.8519 | 95.45 | 0.9545 | 93.75 | 0.9375 | 93.75 | 4.3565 | 72.93 | 25.40 | 14.10 | G2 | 25.40 | 14.10 | G1 | 25.80 | 14.30 | G2 | 13.20 | 4.69 | G1 | 83.65 | | 0.00 | PASS |
| A | Andrew Cornelison | I/TT | 89.66 | 0.8966 | 90.83 | 0.9083 | 81.67 | 0.8167 | 81.82 | 0.8182 | 100.00 | 1.0000 | 90.90 | 4.5090 | 93.06 | 13.50 | 15.00 | G1 | 13.50 | 15.00 | G1 | 13.50 | 15.00 | G2 | 15.00 | 10.01 | G2 | 72.25 | 66.42 | 0.00 | PASS |
| A | Elijah Grabon | I/TT | 55.86 | 0.7586 | 66.67 | 0.6667 | 65.53 | 0.6557 | 63.64 | 0.8636 | 82.60 | 0.8250 | 77.81 | 3.4465 | 77.23 | 4.30 | 13.15 | G1 | 4.30 | 13.15 | G1 | | | | | | | | 23.88 | 66.42 | 64.00 | FAIL |
| A | Arthur Greywolf | I/TT | 79.31 | 0.7931 | 95.83 | 0.9583 | 85.71 | 0.8571 | 100.00 | 1.0000 | 87.50 | 0.8750 | 93.33 | 4.6615 | 93.28 | 24.35 | 14.65 | G2 | 24.35 | 14.65 | G1 | 24.30 | 14.45 | G2 | 29.70 | 6.99 | G3 | 91.06 | | 2.00 | PASS |
| A | Nicholas Graves | I/TT | 82.15 | 0.8621 | 100.00 | 1.0000 | 90.18 | 0.9018 | 90.91 | 0.9091 | 93.75 | 0.9375 | 95.49 | 4.7775 | 88.48 | 12.40 | 13.00 | G2 | 21.60 | 13.00 | G2 | 15.00 | 15.00 | G2 | 27.50 | 9.93 | G3 | 66.46 | | 0.00 | PASS |
| A | Derek Hudgins | I/TT | 62.07 | 0.6207 | 91.67 | 0.9167 | 76.19 | 0.7619 | 72.73 | 0.7273 | 79.16 | 0.7900 | 74.68 | 3.9345 | 92.66 | 8.85 | 13.50 | G1 | 8.85 | 15.90 | G1 | 14.25 | 15.00 | G2 | 27.50 | 9.51 | G3 | 91.91 | 8.09 | 0.00 | FAIL |
| A | Jeffrey Kelly | I/TT | 68.15 | 0.6852 | 100.00 | 1.0000 | 85.10 | 0.8185 | 100.00 | 1.0000 | 100.00 | 1.0000 | 84.00 | 4.2705 | 84.23 | 13.60 | 17.30 | G1 | 13.60 | 17.30 | G2 | 13.35 | 17.30 | G2 | 28.40 | 5.51 | G3 | 92.76 | | 0.00 | PASS |
| A | Thomas Christison | I/TT | 53.10 | 0.5310 | 93.67 | 0.9367 | 83.33 | 0.8333 | 83.67 | 0.8383 | 100.00 | 1.0000 | 84.72 | 4.2255 | 88.72 | 13.60 | 14.55 | G1 | 28.20 | 14.55 | G2 | 13.09 | 19.20 | G3 | 23.40 | 7.93 | G3 | 88.14 | | 0.00 | PASS |
| A | Jacob Pickering | I/TT | 79.31 | 0.7931 | 93.67 | 0.9367 | 66.67 | 0.6667 | 100.00 | 1.0000 | 93.75 | 0.9375 | 84.21 | 4.2215 | 88.47 | 12.75 | 23.70 | G1 | 24.30 | 23.70 | G2 | 14.25 | 15.00 | G3 | 21.90 | 7.71 | G3 | 88.56 | | 0.00 | PASS |
| A | Antonio Quezada | I/TT | 79.31 | 0.7931 | 95.83 | 0.9583 | 95.83 | 0.9524 | 95.65 | 0.9565 | 95.65 | 0.9565 | 80.33 | 4.5315 | 96.23 | 22.20 | 14.55 | G1 | 22.20 | 14.55 | G1 | 19.20 | 19.20 | G3 | 14.40 | 5.96 | G3 | 78.46 | | 0.00 | PASS |
| A | Hunter Ralph | I/TT | 73.56 | 0.7386 | 95.83 | 0.9583 | 86.93 | 0.8519 | 96.45 | 0.9545 | 93.75 | 0.9375 | 86.47 | 4.4705 | 90.47 | 14.25 | 24.93 | G2 | 14.25 | 24.93 | G2 | 15.00 | 15.00 | G2 | 24.90 | 7.81 | G3 | 87.41 | | 0.00 | PASS |
| A | David Ruiz IV | I/TT | 100.00 | 1.0000 | 100.00 | 1.0000 | 100.00 | 1.0000 | 100.00 | 1.0000 | 100.00 | 1.0000 | 96.24 | 4.8120 | 96.24 | 23.20 | 12.75 | G1 | 23.20 | 12.75 | G2 | 4.50 | | G2 | | | | 88.64 | 16.36 | 16.50 | FAIL |
| A | Ashley Sanchez | I/TT | 79.31 | 0.7931 | 83.33 | 0.8333 | 89.59 | 0.7281 | 89.59 | 0.8545 | 88.84 | 0.8125 | 82.48 | 4.2480 | 88.57 | 18.80 | 14.70 | G1 | 18.80 | 14.70 | G1 | 13.30 | 13.30 | G4 | 13.55 | 9.3 | G2 | 70.83 | | 0.00 | PASS |

**Class Statistics**

| | Block Test 1 | Block Test 2 | Block Test 3 | Block Test 4 | Block Test 5 | Comp Test | | Ground PA 3 | Local PA 1 | Ground PA 2 | Local PA 2 | Overall Score |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| High | 100.00 | 100.00 | 95.24 | 100.00 | 100.00 | 96.24 | High | 100 | 99 | 100 | 100 | 91.70 |
| Low | 53.97 | 66.67 | 65.57 | 72.73 | 62.60 | 72.93 | Low | 59 | 54 | 88 | 25 | 23.50 |
| Average | 84.84 | 93.26 | 88.68 | 88.59 | 89.84 | 88.67 | Average | 88.35 | 73.14 | 95.69 | 70.00 | 76.30 |

Exhibit F9d
Page 1
of 1

EXHIBIT 7



EXHIBIT 8

 **ORDER**

**U.S. DEPARTMENT OF TRANSPORTATION**
FEDERAL AVIATION ADMINISTRATION

3120.27A

8/13/98

**SUBJ:** PERFORMANCE VERIFICATION FOR EN ROUTE AND TERMINAL INITIAL QUALIFICATION TRAINING

1. **PURPOSE.** This order provides policy, procedures, and guidance for conducting performance verification assessments on students who have completed en route or terminal air traffic controller initial training at the Federal Aviation Administration (FAA) Academy.

2. **DISTRIBUTION.** This order is distributed to branch levels of the Office of Air Traffic Resource Management Program (ATX), FAA Academy Air Traffic Division, and the regional Air Traffic Divisions.

3. **CANCELLATION.** Order 3120.27, Performance Verification For En Route and Tower Initial Qualification Training, dated July 14, 1994, is canceled.

4. **BACKGROUND.** Prior to the inception of "Train to Succeed", the FAA Academy assessed students using a point value system. This system was used as a screening process in conjunction with curriculum objectives. A numerical grading system has proven inadequate in a "Train to Succeed" environment. In order to transition to a "Train to Succeed" process, the Performance Verification Program was established in Training (ATX-100). ATX-100 is responsible for assessing students completing FAA Academy initial controller training. This has given the FAA Academy freedom to train without being responsible for the assessment process. The shift from a point based assessment yields a process that more closely mirrors the field. The process will give each student every opportunity to succeed.

5. **PROCEDURES.**

   **a**. The Performance Verification (PV) Program assesses all students completing en route or terminal initial qualification courses.

   **b.** Performance Verification consists of an academic examination and an assessment of a skill based scenario. A score of 70 percent is required for successful completion of the academic assessment.

   **c.** PV specialists within ATX-100 and/or current field staff or supervisory personnel will assess student performance on a skill based scenario.

   **d.** Students shall be assessed within the requirements outlined in the current edition of Order 7110.65, Air Traffic Control, and Order 3120.4, Air Traffic Technical Training. Results of the PV scenario shall be documented on FAA Form 3120-25, ATCT/ARTCC OJT Instruction/Evaluation Report.

   **e.** Following the scenario, the student will be "debriefed" by the PV assessor. During this debrief, the PV assessor will ask for explanations regarding questionable control actions and weigh responses in order to evaluate the student's cognitive skills. This investigation provides PV assessors the opportunity to identify areas that need improvement.

3120.27A                                                                                      8/13/98

    **f.** Student performance on skill based scenarios shall be assessed within the PV standards process. The standards process consists of four critical elements:

    **(1)** Rater Reliability. Personnel selected as PV assessors shall be thoroughly trained on both the PV process and the student debriefing process prior to conducting an evaluation. This provides a reliable method for insuring that assessments take place in a similar manner for each student.

    **(2)** PV Scenarios. The scenarios incorporate field requirements. Once a student can perform the tasks necessary to successfully run a PV scenario, they will have demonstrated the skills necessary to begin field training.

    **(3)** PV Assessment. Initial assessments are conducted using one PV assessor observing one student. The PV assessment will determine if a student has demonstrated the fundamental skills and knowledge necessary to begin field OJT.

    **(4)** PV Reassessment. In the event of a student's unsuccessful performance of a PV scenario, the student shall be returned to the FAA Academy for additional targeted training on areas identified by the PV assessor. After completion of this training, the student will be assessed on a second PV scenario. Two PV assessors will evaluate the second scenario. The two assessors must reach a consensus before a decision can be made regarding the student's success or failure.

NOTE: The PV assessor that evaluated the unsuccessful scenario shall not assess the second scenario.

    **g.** In the event a student is unsuccessful after the second PV scenario assessment, ATX-100 will notify the appropriate regional Air Traffic Division. Disposition of the unsuccessful student will be determined by the regional Air Traffic Division in accordance with appropriate directives.


*Charles E. Sandler*

David R. Sprague
Acting Program Director for Air Traffic
    Resource Management

# EXHIBIT 9

| From: | Alethia E Futtrell |
|---|---|
| To: | Stephanie Parks |
| Cc: | Brian Harmelink; Cynthia Haley; Ken MacNeill |
| Subject: | Re: 3120.4 Apps D & F revisions |
| Date: | Tuesday, June 12, 2012 2:55:29 PM |

Stephanie,

Follow-up to our phone conversations about **Section 2B. Initial Tower Cab Training** ...

Last sentence in **General:** During the course, the Tower Visibility and Control Tower Operator (CTO) exams are administered as well as a Comprehensive Final Exam and a Performance Verification scenario S .

Omitted/rewrite of (d) PV Assessment Retake from handout in **Evaluation:**

(d)      **PV Assessment Retake.** Students that are unsuccessful during a PV assessment will receive skill enhancement training from the FAA Academy, Air Traffic Division, Initial Training Branch, AMA-510, in the areas identified on the Evaluation Report.
(i)      After completion of the training, a PV retake scenario must be conducted.
(ii)      This evaluation shall be based on the student's performance on all aspects of the scenario, not just the areas where the student has received skill enhancement training.
(iii)      Two evaluators not involved in the first assessment are used. These evaluators must reach a consensus regarding the student's failure.

All else looks fine. Thanks,

*Alethia*



**Alethia E Futtrell, Ed.D**
Manager Quality Branch, AMA-505
AMA-500 QMS-ISO Coordinator
405-954-6937   FAX  405-954-4791
**Delivering Tomorrow's Training Today**

Stephanie Parks---06/12/2012 12:02:37 PM---Hi all, You can make notes via Track Changes or write up comments separately. Please pay special at

| From: | Stephanie Parks/AMC/FAA AMA-520A, CBI & Curriculum Support Section |
|---|---|
| To: | Brian Harmelink/AMC/FAA@FAA, Cynthia Haley/AWA/FAA@FAA, Alethia E Futtrell/AMC/FAA@FAA, Ken MacNeill/AMC/FAA@FAA |
| Date: | 06/12/2012 12:02 PM |
| Subject: | 3120.4 Apps D & F revisions |

Hi all,

You can make notes via Track Changes or write up comments separately. Please pay special attention to the General statement for TSEW. It seems a little sparse to me.

[attachment "3120.4_App_D&F.docx" deleted by Alethia E Futtrell/AMC/FAA]


Stephanie Parks
Instructional Systems Specialist
CBI and Curriculum Development Section, AMA-520A
405-954-0249

EXHIBIT 10

# STUDENT PROGRESS REPORT
Air Traffic Division, AMA-500, Initial Tower Cab Training

## Name: Harold Rutila IV

Facility: TTT

Course Number: 50046

Class Number: 99899

**DATE OF THIS REPORT:**

Jun 14, 2021

| TOTAL POINTS ACCRUED: | 50.64 |
| TOTAL POINTS POSSIBLE: | 85.00 |
| POINTS NEEDED TO PASS: | 19.36 |
| POINTS STILL AVAILABLE: | 15.00 |

| TESTS and EVALUATIONS | VALUE of FINAL SCORE | STUDENT SCORE | POINT VALUE |
|---|---|---|---|
| Block Test 1 | 1% | 100.00 | 1.0000 |
| Block Test 2 | 1% | 100.00 | 1.0000 |
| Block Test 3 | 1% | 88.10 | 0.8810 |
| Block Test 4 | 1% | 100.00 | 1.0000 |
| Block Test 5 | 1% | 100.00 | 1.0000 |
| Comp Exam | 5% | 96.24 | 4.8120 |
| PA Run 1 | 30% | 79.00 | 23.70 |
| PA Run 2 | 15% | 85.00 | 12.75 |
| PA Run 3 | 30% | 15.00 | 4.50 |
| PA Run 4 | | 0.00 | |



**Points Accrued**

Minimum Passing Score

Points Accrued

EXHIBIT 11

## Page 1

```
 1        U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION
                  Oklahoma City Area Office
 2

    HAROLD E. RUTILA, IV,      §EEOC No. 560-2018-00133X
 3                             §
                               §
 4         Complainant,        §Agency No.
                               §2017-26956-FAA-05
 5   -v-                       §
                               §
 6   ELAINE L. CHO, SECRETARY, §Date:  August 13, 2019
     DEPARTMENT OF             §
 7   TRANSPORTATION, FAA,      §
                               §
 8         Agency.             §
 9

10   *********************************************
11               ORAL DEPOSITION
12            RICHARD WAYNE MITCHELL
13               AUGUST 21, 2019
14   *********************************************
15        ORAL DEPOSITION OF RICHARD WAYNE MITCHELL, produced
16   as a witness at the instance of the Complainant, and
17   duly sworn, was taken in the above-styled and -numbered
18   cause on the 21st day of August, 2019, from 9:00 a.m. to
19   12:01 p.m., before Andrea L. Massimini, CSR in and for
20   the State of Texas, reported by machine shorthand, at
21   the offices of Federal Aviation Administration Southwest
22   Regional Office, 10101 Hillwood Parkway, Floor 6N-300,
23   Fort Worth, Texas.
24

25
```

## Page 2

```
 1             A P P E A R A N C E S
 2   FOR THE COMPLAINANT:
 3     Mr. Eric P. Dama, Esq.
       LAW OFFICE OF ROB WILEY, P.C.
 4     2613 Thomas Avenue
       Dallas, Texas  75204
 5     214.528.6500
       edama@robwiley.com
 6

     FOR THE AGENCY:
 7
       Ms. Elizabeth Glass, Esq.
 8     FEDERAL AVIATION ADMINISTRATION
       SOUTHWEST REGIONAL OFFICE
 9     10101 Hillwood Parkway
       Room Number 6N-300
10     Fort Worth, Texas  76177
       817.222.5082
11     Elizabeth.Glass@FAA.gov
12   ALSO PRESENT:
13     Harold E. Rutila, IV
14

15

16

17

18

19

20

21

22

23

24

25
```

## Page 3

```
 1             I N D E X
 2   Appearances . . . . . . . . . . . . . . . . . . 2
 3   Exhibit Index . . . . . . . . . . . . . . . . . 3
 4   RICHARD WAYNE MITCHELL
 5     Examination by Mr. Dama . . . . . . . . . 4
 6   Signature and Corrections. . . . . . . . . . . 73
 7   Reporter's Certificate . . . . . . . . . . . . 75
 8

10             E X H I B I T   L I S T
11   NO.        DESCRIPTION                      PAGE
12   Exhibit 1 . . . . . . . . . . . . . . . . . . 27
        E-mail chain dated April 3, 2015
13   Exhibit 2 . . . . . . . . . . . . . . . . . . 38
        Notification of informal EEO complaint
14   Exhibit 3 . . . . . . . . . . . . . . . . . . 40
        Resolution Agreement
15   Exhibit 4 . . . . . . . . . . . . . . . . . . 51
        Message chain dated August 26, 2016
16

17

18

19

20

21

22

23

24

25
```

## Page 4

```
 1          P R O C E E D I N G S
 2        (On the record at 9:00 a.m.)
 3          RICHARD WAYNE MITCHELL,
 4   having been first duly sworn, testified as follows:
 5               EXAMINATION
 6   BY MR. DAMA:
 7      Q.  Good morning, Mr. Mitchell.  My name is Eric
 8   Dama.  I represent Harold Rutila in this matter with the
 9   Agency.
10          Before we begin, do you have any titles or
11   names that you prefer I address you by?
12      A.  You can call me Rick is fine.
13      Q.  Okay.  And could you just state and spell your
14   full name for the record, please?
15      A.  Sure.  Full name is Richard Wayne Mitchell;
16   R-I-C-H-A-R-D, W-A-Y-N-E, M-I-T-C-H-E-L-L.
17      Q.  All right.  And now, have you had your
18   deposition taken before?
19      A.  Yes.
20      Q.  About how many times?
21      A.  I'd say four.
22      Q.  Are they all -- were they in connection with
23   previous EEO matters?
24      A.  It was a class action lawsuit.  I don't know
25   that -- yeah, it was -- yes.
```

Page 17

1    Q.  Are there any other potential avenues through
2  which mediation is available?
3    **A.  Not that comes to mind.**
4    Q.  Okay.  So -- all right.  So if -- I know you
5  had said if they -- generally speaking, if an individual
6  does not pass the academy, generally speaking, no
7  authority to reinstate them, that they would have to
8  reapply.
9         And sometimes I tend to summarize what you
10  say just because -- to preface a question.  If you
11  disagree with anything that I said in the summary or
12  think I'm mischaracterizing it, please just let me know.
13    **A.  Okay.**
14    Q.  But that was my understanding of what you said.
15         So, generally speaking, when somebody who
16  has been let go from the academy and then reapplies,
17  what's the likelihood of them being, you know,
18  successful in that reapplication?
19    **A.  So if there are individuals who are available**
20  **for selection who haven't previously failed academy**
21  **training, they're going to be selected first.**
22    Q.  So is it -- now, it's true that if somebody
23  hasn't passed the academy, that can be used as a
24  potentially disqualifying factor in their reapplication?
25    **A.  It's not a disqualifying factor.  They're still**

Page 18

1  **qualified for the position.  Again, those who have not**
2  **previously failed academy training would be considered**
3  **first.**
4    Q.  Now, during your time as manager, in that role,
5  are you aware of anybody who did not pass the academy,
6  reapplied, and was successful in that reapplication?
7    **A.  Meaning they came back to the academy?**
8    Q.  Yes.
9    **A.  Yes, there was one individual that I recall.**
10    Q.  So it is possible?
11    **A.  It did happen.  That individual had a name**
12  **change.**
13    Q.  A name -- so do you mean that they didn't
14  realize that they went -- you-all didn't initially
15  realize that they had gone through the academy?
16    **A.  Correct.**
17    Q.  What about anybody else outside of that
18  instance?
19    **A.  Through the application process, I don't recall**
20  **anyone else.**
21    Q.  And is that typically because -- have you-all
22  found that, I guess, with the amount of vacancies there,
23  that, typically speaking, individuals who haven't gone
24  through the academy -- that there's enough individuals
25  applying who haven't gone to the academy yet to fill

Page 19

1  those roles?
2    **A.  Yes.  There is typically not a shortage of**
3  **applicants for the air traffic control positions, so**
4  **we've not had a problem finding a sufficient amount of**
5  **applicants.**
6    Q.  And then outside of the mediation process or
7  reapplication, any other way in which an individual who
8  doesn't initially pass the academy can get back in?
9    **A.  Back into air traffic control?**
10    Q.  Into the academy, correct.
11    **A.  Not that I'm aware of.**
12    Q.  So you had mentioned the mediation process.  I
13  told you there will be some things that I'm going to ask
14  questions but preface it with, I don't want to know
15  about certain things.
16         I don't want to know about the substance of
17  any, you know, mediations that you've had, any
18  conversations that occurred during the mediation
19  process, communications, anything like that.
20         But you had mentioned that mediation is one
21  of the avenues in which somebody can return to the
22  academy.  What is your role in that process -- or what
23  was it --
24    **A.  Sure.**
25    Q.  -- when you were in that position?

Page 20

1    **A.  When I was the manager of the technical**
2  **onboarding and placement team, my role was, if there was**
3  **going to be a mediation, I was the one who conducted**
4  **that mediation for the Agency -- or would participate,**
5  **not conducted, but participated in the mediation.**
6    Q.  So would you be considered the -- or, I guess,
7  were you acting as the settlement authority in those
8  matters?
9    **A.  Yes.**
10    Q.  Did you have the, I guess, full discretion
11  to -- you know, to either resolve a case or not resolve
12  a case?
13    **A.  Yes, I did.**
14    Q.  Did you typically work in conjunction with
15  anyone with respect to that -- you know, you in that
16  role?
17    **A.  Sure.  Most -- not most, but I would have**
18  **somebody representing the academy also sitting in the**
19  **mediation with me so they could discuss any of the**
20  **aspects of the mediation.**
21    Q.  Can you give me example of who sometimes that
22  would -- like is it the director of the academy or an
23  instructor or --
24    **A.  It was typically the air traffic training**
25  **division manager or deputy -- director or deputy**

LEXITAS

Page 21

1 director.

2    Q. And was that any one specific person while you

3 were in that role?

4    A. I recall two individuals. Jim Doskow,

5 D-O-S-K-O-W, Wayne Coley, C-O-L-E-Y. And there was one

6 other individual towards the end, Andy Taylor,

7 T-A-Y-L-O-R, I believe.

8       There could have been another individual,

9 but those are the three I remember.

10    Q. So even though your office wasn't necessarily

11 responsible for the actual training and the things

12 happening at the academy, you would have the authority

13 to reinstate somebody into the academy if the academy

14 had determined that they didn't pass the academy,

15 though, correct?

16    A. That is correct. Our office was the manager of

17 records for the students.

18    Q. So when you receive notice of -- well, I

19 shouldn't assume that.

20       Do you typically -- I guess what I'm

21 wondering is, when there's an EEO complaint filed --

22 again, just generally speaking; I'm not asking about the

23 specifics of anyone in particular -- can you walk me

24 through kind of, you know, how you go about handling it.

25    A. Sure. So if a student filed an EEO complaint,

Page 22

1 I would receive notification from our civil rights

2 office that we were in the informal stage of the EEO

3 complaint process, and they would ask if I would be

4 interested in doing mediation.

5    Q. And then you would either respond yes or no?

6    A. Correct, yes.

7    Q. How would you make that determination?

8    A. So I would ask the academy. They would provide

9 information on that student as far as information on

10 their performance in the class and performance in the --

11 the performance evaluations at the end of the course and

12 look at those things before I would respond.

13    Q. Would anyone from the academy make any

14 recommendations as far as -- I guess, regarding the

15 merits of the -- of any individual EEO complaint?

16    A. So I wouldn't say that they would make any

17 recommendations based upon the merits of the EEO

18 complaint, but they would -- would indicate if they saw

19 something in the training that we might need to look at.

20    Q. Is that something that they would not have

21 noticed, though, like when they're, you know, actually

22 at the academy and doing the actual training?

23       MS. GLASS: Objection. Calls for

24 speculation.

25    Q. (BY MR. DAMA) You may -- you may answer.

Page 23

1    A. So I was not and have not been a part of the

2 academy. They are a professional organization that has

3 processed tens of thousands of students. I'm sure they

4 know what they're doing and have a process to deal with

5 any kind of irregularities in training. But, again,

6 that would be speculation on my part. I'm not -- I was

7 not a part of that process.

8    Q. Now, do you recall -- do you recall Mr. Rutila

9 filing an EEO complaint back in 2016?

10    A. Yes.

11    Q. And what was your role in Mr. Rutila's EEO

12 case?

13    A. So the initial informal stage EEO complaint did

14 come in to me to determine if I would want to be a part

15 of mediation or not.

16    Q. And do you recall what -- how you answered that

17 question?

18    A. Yes. I chose to decline mediation.

19    Q. And do you recall what information you relied

20 upon in making that determination?

21    A. If I remember correctly, at that point he

22 had -- he being Mr. Rutila -- had entered several

23 avenues of questioning his termination, including a FOIA

24 and other things that -- and I spoke to our legal

25 counsel. And after speaking with them, I decided not to

Page 24

1 mediate.

2    Q. And in making -- and just, again, at a broader

3 level in making the determination whether or not to

4 mediate an EEO complaint, do you typically speak to any

5 counsel for the Agency?

6    A. So, no, I wouldn't always speak to them. But

7 on occasion, the -- I did have a working relationship

8 with some individuals in the legal office. And because

9 of the other complaints that Mr. Rutila had filed, I did

10 speak to -- seek their guidance in this particular case

11 and others that were similar.

12    Q. Now, do you recall -- as far as individuals

13 from the academy, do you recall who you either spoke

14 with or received information from regarding Mr. Rutila's

15 EEO complaint?

16    A. The manager of their -- I'm not sure if I'm

17 going to get the title right, but I'll call it their

18 quality assurance office, the office that was

19 responsible for the performance verifications, the final

20 exam, you might say, at the end.

21       The manager of that office was Aletha

22 Futtrell. I'll try. Aletha, I think, is A-L-E-T-H-A;

23 Futtrell is F-U-T-T-R-E-L-L. I can correct it later.

24       But that's who I went to, one of -- her and

25 another individual that was assigned to provide us that

LEXITAS

Page 25

1 documentation. The other individual was Pamela Graham.

2  Q. And what is her title or position,

3 Pamela Graham -- or was it at that time?

4  A. So I don't know what her title or position was.

5 But I know she was in the academy, and she is the one

6 who worked any FOIA request. Any request for data for

7 the academy, she would gather that information.

8  Q. Do you recall speaking to any of -- any of

9 Mr. Rutila's instructors at all?

10  A. I don't recall.

11  Q. And I'm sorry. And you said Ms. Futtrell in --

12 what was her position?

13  A. She -- and I don't know if it was the exact

14 title, but she was the manager of the office that was

15 responsible for the performance verification.

16  Q. And what is that? I guess, what --

17  A. Performance verification is the -- is the last

18 piece of the academy training where the student can

19 demonstrate what they've learned. It's a graded

20 exercise.

21  Q. And within your recollection, is that a portion

22 of the academy that the Agency said, you know,

23 Mr. Rutila did not pass, or was the reason -- I guess,

24 let me rephrase -- was the reason for his not passing

25 the academy?

Page 26

1  A. So the students are graded throughout the

2 training. The performance verification is just a piece

3 of that. And it's an overall score. So it is a piece

4 of it but not the entire portion.

5  Q. But would Ms. Futtrell have had the specific

6 information as to why Mr. Rutila didn't pass the

7 academy?

8  A. Her staff would, yes. Her staff is who

9 conducts the performance verification portion of the

10 academy training.

11  Q. Now, do you recall either Ms. Futtrell,

12 Ms. Graham, or anyone from the actual academy

13 recommending against mediating with Mr. Rutila?

14  A. No.

15  Q. And now, was the -- was the decision not to

16 extend ADR to Mr. Rutila based on his filing of a

17 complaint with the OSC?

18     MS. GLASS: Objection. Relevance.

19  A. If I remember correctly, there were also a FOIA

20 request, and after speaking with legal counsel, decided

21 that anything that could have been discovered in

22 mediation would also be discovered through those

23 processes, so I elected not to mediate.

24  Q. (BY MR. DAMA) What -- do you recall what

25 Mr. Rutila was seeking in his FOIA requests?

Page 27

1  A. I do not recall. I apologize.

2  Q. Do you recall, was it the fact that he had --

3 strike that.

4     Now, does the FAA have any type of policy

5 regarding conducting or not conducting ADR with trainees

6 who fail the academy?

7  A. There is no policy, no.

8  Q. To your recollection, was there any type of

9 either policies or, if not like a written policy, any

10 guidelines in place saying that?

11  A. Not that I recall.

12  Q. Now, do you know who Luis Diaz is?

13  A. Yes.

14     MS. GLASS: Okay. Objection. Relevance.

15  Q. (BY MR. DAMA) I'm going to show you what will

16 be marked Exhibit 1.

17     (Exhibit 1 marked.)

18  Q. (BY MR. DAMA) And then just let me know once

19 you've had a chance to read through it.

20     MS. GLASS: I'll renew my relevance

21 objection. If I could just put a running objection to

22 this line of questioning in the record.

23     MR. DAMA: Yes.

24     And just note it for the record, you know,

25 I mean, it would be our position that what we're -- what

Page 28

1 this case is really about is that -- or at least in one

2 sense, exceptions to -- exceptions to being able to

3 retrain for the Agency academy and potential reasons for

4 that, one of the reasons as given has been mediation.

5     But one of these -- again, at least this

6 document seems to indicate that there's some policy that

7 indicates that that will not be offered to -- or that

8 option would not be offered to anybody.

9  Q. (BY MR. DAMA) So have you had the chance to

10 review this?

11  A. I looked through the substance of it. I

12 didn't --

13  Q. Okay. I'm sorry. You said you looked through

14 what part?

15  A. I didn't read the part -- the Confidentiality

16 and Privacy Act Information; I skipped over that. But I

17 read the body of the e-mails.

18  Q. Okay. And have you seen this document before?

19  A. I don't think so.

20  Q. Okay. And, again, my questions are just going

21 to be based off of your personal knowledge.

22  A. Sure.

23  Q. What I will represent -- and I am looking, at

24 least right now specifically, at the bottom half of the

25 page. I'll represent it at least appears to be -- and

Page 29

1 this is a document that was contained in the report of
2 investigation in Mr. Rutila's case.
3        Again, the bottom half of the page, it
4 seems to indicate that this is an e-mail from Luis Diaz
5 to several other FAA employees from April 3rd, 2015,
6 that states:  FYI, this case, along with any other
7 academy training failure, will not be offered ADR.
8        Did I read that correctly?
9    A.  It looks like it, yes.
10    Q.  Are you aware -- and, again, I'm not asking
11 about the specifics of any case in particular.  But are
12 you aware of what Mr. Diaz is referring to in this
13 e-mail?
14    A.  I am not.  This is the first time I've seen it.
15    Q.  Are you aware of any policies stating that, you
16 know, any academy training failures will not be offered
17 ADR?
18    A.  I am not aware of anything stating that.
19    Q.  Are you aware of any -- I know I said policies.
20 Are you aware of any guidelines that state that?
21    A.  I have never been told or seen anything that
22 would say that we could not do ADR for an air traffic
23 training failure.
24    Q.  When you were manager in the onboarding and
25 technical -- so I guess -- so when you were manager in

Page 30

1 the onboarding and placement department, was this either
2 a guideline or practice of yours?
3    A.  Was what a guideline or a practice?
4    Q.  This apparently blanket rule that no academy
5 training failure will be offered ADR.
6    A.  No.  I don't recall ever being told I couldn't
7 mediate.
8    Q.  Did you ever work -- in your role as manager in
9 that department, did you ever work with Mr. Diaz at all?
10    A.  Yes, I did.
11    Q.  I guess, in what capacity?
12    A.  He was the -- so civil rights would provide a
13 mediator when we did do mediation, and he participated
14 in that role multiple times.
15    Q.  So he was a mediator?
16    A.  Yes.
17    Q.  Now, did he have any either influence or role
18 in your capacity to either decline or accept mediation
19 with any particular individual?
20    A.  No, he did not.
21    Q.  So was Mr. Rutila's request for mediation
22 denied on this basis that no academy training failure
23 will be offered ADR?
24    A.  No, it was not.
25    Q.  All right.

Page 31

1        MR. DAMA:  It's been close to an hour.  Do
2 y'all want to take a quick break?
3        MS. GLASS:  Yeah, that would be great.
4 Thank you.
5        MR. DAMA:  All right.  We will go off the
6 record.
7        (Break from 9:48 a.m. to 10:04 a.m.)
8        MR. DAMA:  We are back on the record.
9    Q.  (BY MR. DAMA)  Mr. Mitchell, do you understand
10 that you are still under oath?
11    A.  I do.
12    Q.  Okay.  Are you familiar with a former
13 trainee -- or at least -- yeah, a former academy trainee
14 named Madeline Bostic?
15    A.  Yes.
16    Q.  And how are you aware of Ms. Bostic?
17    A.  Ms. Bostic filed an EEO complaint in which I
18 mediated, and she came back to the academy again for
19 training.
20    Q.  And kind of like a few of the things I have
21 said before, I have specific questions.  As far as
22 things I don't want to know about, the specifics of any
23 allegations she may have made as well as anything that
24 occurred in the confidential --
25    A.  Okay.

Page 32

1    Q.  -- in the confidential mediation, any
2 communications, things like that.
3        Now, have you ever communicated with
4 Ms. Bostic outside of the ADR mediation process?
5    A.  So, I mean, I was the manager of the office.
6 We did a briefing their first day where we kind of gave
7 them an overview of the placement process.  I mean,
8 there were thousands of students.  I'm sure I spoke to
9 her at some time, but nothing that I remember in
10 particular.
11    Q.  So do you like welcome everybody when they come
12 in like on their first day or --
13    A.  It wasn't always me.  Somebody from my staff
14 would always be there, though, for a briefing their very
15 first day.
16    Q.  Any other instances that you can recall outside
17 of that?
18    A.  No.
19    Q.  Now, outside of the mediation process, did you
20 ever discuss with anyone Ms. Bostic being recycled back
21 into the academy program?
22    A.  Could you clarify what you mean by spoke to
23 anyone?
24    Q.  Well, yeah.  I guess, outside of the -- outside
25 of the mediation -- you know, outside of that mediation

Page 33

1 and prior to that mediation, did you ever discuss with
2 anyone, you know, either the possibility or the
3 resolution of Ms. Bostic being recycled back into the
4 program?
5     A.  I don't recall speaking to anyone prior to the
6 mediation.  After the mediation, I would have spoke to
7 the academy about her coming through again and -- I
8 can't really go any further without -- talking about the
9 mediation without -- but, yes, I did speak to the
10 academy afterwards to let them know that she was
11 recycling.  And obviously HR to process the paperwork.
12 I'm sorry.
13    Q.  Do you recall when you first became aware of
14 Ms. Bostic's mathematical elimination from the academy?
15    A.  So in my role, I mean, we had anywhere from 4-
16 to 500 students at the academy at any particular time.
17 I don't know that I necessarily specifically remembered
18 or paid attention to each student if they passed or
19 failed.
20        So, I guess, could you repeat your
21 question?
22    Q.  Yeah.
23        Do you recall when you first became aware
24 of her elimination from the academy?
25    A.  It probably would have been when I received the

Page 34

1 EEO complaint.
2     Q.  Would there have been any reason that you would
3 have been made aware of it before that?
4     A.  No.  It would have been no different than any
5 other termination.  I can't remember, at the time of her
6 termination, if I was signing the letters or not or if
7 JB Goelz was in at that time.  I don't recall.
8     Q.  I meant to ask this earlier, but I think I just
9 forgot.  Is there anybody underneath Mr. Goelz?
10    A.  No.
11    Q.  No?
12    A.  No.
13    Q.  Okay.  Now, did you have any conversations with
14 Ms. Bostic either on the day of or close to the time
15 that she was eliminated from the academy?
16    A.  Not that I recall.
17    Q.  Regarding anyone else who may have been
18 eliminated from the academy, do you recall any
19 conversations with them either at the time or close to
20 their termination?
21    A.  In general anyone who failed the academy?
22    Q.  Yes.
23    A.  Yes.  On occasions people would come to our
24 office and want to discuss their termination.  But, I
25 mean, I couldn't tell you a specific student or name a

Page 35

1 particular case.
2     Q.  Did you -- in instances like that, you know,
3 would you engage with them?  Are there any policies
4 about -- you know, I guess, how would you handle that if
5 someone did come over to the office and want to discuss
6 their termination?
7     A.  So it kind of depends on the person.  Some of
8 them were quite distraught and -- but, generally
9 speaking, you know, it was best to limit engagement with
10 them.  If they were distraught, we would try to calm
11 them down.  But other than that, we limited our
12 engagement.  And I say "we" because it was the office,
13 not just me.
14    Q.  How many people were in that office?
15    A.  Different times, different number of people.
16 We started with me and two other individuals and three
17 contractors.  It grew to, I believe, six employees at
18 one point including myself and three -- plus three
19 contractors.
20    Q.  Now, is this office close to the academy?
21    A.  At one point -- so the academy classes are
22 actually in two different buildings.  At different times
23 we were located in one of the two buildings.  But, yes,
24 so we were always close to the classrooms.
25    Q.  And then -- now, prior to engaging in the

Page 36

1 mediation and the ADR process, are you aware of anyone
2 in your office who discussed either recycling or
3 retraining Ms. Bostic?
4     A.  I'm not aware of anyone.
5     Q.  Would anyone in your office outside of you have
6 been made aware of her informal EEO complaint?
7     A.  Made aware by civil rights or by myself?
8     Q.  Either way.
9     A.  So not by civil rights.  And I don't recall
10 particularly with Ms. Bostic, but, generally speaking, I
11 would occasionally go to my staff to seek information.
12    Q.  What kinds of information?
13    A.  What class number were they in?  What class
14 dates were they here?
15    Q.  Anything else?
16    A.  Not that I recall.
17    Q.  Would you let them know why you were seeking
18 that information?  Like were they aware that it was
19 being sought in conjunction with an EEO complaint?
20    A.  Generally speaking, I tried not to.
21    Q.  Was there -- outside of your office kind of in
22 that process, would there be anyone that you either
23 informed or, you know, made aware of that complaint --
24 or not that complaint specifically but just generally
25 speaking?

Page 37

1    A. Yes.

2         MS. GLASS: Objection. Relevance.

3         And I'd like to just continue my objection

4  to this -- the running objection in the record. Thank

5  you.

6    A. I would notify Aletha Futtrell and Pam Graham

7  to seek information on the students, information being

8  their time at the academy, their scores, performance.

9    Q. (BY MR. DAMA) And is it Aletha or Pam who

10  would be able to get that specific information from like

11  the individual instructors or --

12    A. Yes.

13    Q. Now, did you take any action with respect to

14  bringing Ms. Bostic back into the training program

15  either on or close to the day that she was

16  mathematically eliminated?

17    A. No.

18    Q. Any action related to recycling Ms. Bostic into

19  the program outside of the mediation process?

20    A. No.

21    Q. Now, did you ever instruct Ms. Bostic to file

22  an EEO complaint?

23    A. No.

24    Q. Did you ever ask anyone else to instruct

25  Ms. Bostic to file an EEO complaint?

Page 38

1    A. No.

2    Q. So outside of agreeing to the mediation --

3  or -- excuse me.

4         Outside of agreeing to recycle Ms. Bostic

5  into the training program -- well, let me strike that.

6  I'm sorry. Let me ask you a different question.

7         Would anyone other than you have the

8  authority or ability to recycle Ms. Bostic into the

9  training program?

10    A. I suppose my leadership above me, but, no,

11  other than that, nobody would have that authority.

12    Q. Is that -- are these the kinds of matters that

13  they would typically get involved in or make that

14  decision on?

15    A. No, they would not.

16    Q. I will show you what will be marked Exhibit

17  Number 2.

18         (Exhibit 2 marked.)

19    Q. (BY MR. DAMA) And then just take however long

20  you need to review this and just let me know when you've

21  had the opportunity to do so.

22    A. Okay.

23    Q. Have you seen Exhibit Number 2 before?

24    A. I don't think I have.

25    Q. In looking at it now, do you know what this is?

Page 39

1    A. Looks like it's a notification of an informal

2  EEO complaint.

3    Q. Are these the type -- do you typically receive

4  these or someone else in your office typically receive

5  thoso?

6    A. So I think this might be part of what Aletha

7  Futtrell's team put together when I would ask them for

8  information on a student.

9    Q. And so -- as far as like their performance,

10  things like that?

11    A. Yes, and so the score's here. And I think it

12  was the way the academy kept track of information they

13  were requested to provide.

14    Q. And would this have been a -- would this have

15  been, I guess, a document that you would have based any

16  decision on to either conduct ADR or recycle a trainee

17  back into the academy program?

18    A. No, not typically.

19    Q. So is there anything in this document that, you

20  know, you relied upon in making that decision in

21  Ms. Bostic's particular case?

22    A. To recycle her?

23    Q. Yes.

24    A. No.

25    Q. Do you recall what information you relied upon?

Page 40

1         MS. GLASS: Objection. That's covered by

2  our privacy. That would be mediation.

3    Q. (BY MR. DAMA) Outside of anything that

4  occurred in the mediation process?

5    A. The information that I relied upon to reinstate

6  Ms. Bostic came through the mediation process.

7    Q. Do you recall what date that mediation took

8  place?

9    A. I don't.

10    Q. I will show you what will be marked Exhibit

11  Number 3.

12         (Exhibit 3 marked.)

13    Q. (BY MR. DAMA) And then let me know once you've

14  had the opportunity to review that.

15    A. Okay.

16    Q. Have you seen Exhibit Number 3 before?

17    A. Yes.

18    Q. And what is it?

19    A. It is a resolution agreement between the

20  Agency, represented by me, and Madeline Bostic.

21    Q. And is this the agreement by which Ms. Bostic

22  was rescheduled to, I guess -- I think I've used

23  different terms, but recycled into the training program?

24    A. Yes, it is.

25    Q. And then I'm looking on the last page there.



EXHIBIT 12

EXHIBIT F2

2                **AFFIDAVIT**

4   **State of Oklahoma**

6   **County of Oklahoma**

8   I, **Richard W. Mitchell,** make the following statement freely and voluntarily to
9   Patricia Farrell, who has identified herself to me as an EEO Investigator for the
10   **Federal Aviation Administration, DOT,** investigating a complaint of
11   discrimination filed by **Tajohnae A. Miller,** knowing that this statement may be
12   used in evidence. I understand that this statement is not confidential and may be
13   shown to any interested party. I hereby solemnly swear/affirm:

15   *Issue: Was Complainant, a former Air Traffic Controller Specialist (ATCS) Trainee, 2152,*
16   *FV-01, discriminated against based on her race (African American) when, on August 6,*
17   *2016, she learned that another trainee (Caucasian) who had experienced similar computer*
18   *glitches/issues, during training, was reinstated to the FAA Academy, while she was denied the*
19   *opportunity?*

21   1. Provide your full name, your position, title, series, and grade. When did you
22       begin your employment in your current position?
23       **A: Richard "Rick" W. Mitchell, Manager, On-Boarding and Placement**
24       **Team, FV-340-K. I have held my current position since May 2014.**

26   2. Please provide your organization from the smallest (organizational) entity to
27       the largest.
28       **A: Technical On-Boarding and Placement Team, Mike Monroney**
29       **Aeronautical Center, FAA, Headquarters, DOT, Oklahoma City, OK.**

31   3. The accepted basis is above. Please identify yourself by the bases of this
32       complaint.
33       **A: My race is white.**

35   4. Who is currently your first level supervisor; who is your second level
36       supervisor? Provide name and position titles.
37       **A: My first level supervisor is Gene Burdick, Deputy Director, People**
38       **Services; my second level supervisor is Mark Hoover, Director, People**
39       **Services.**

Initials _RM_

reinstatement based on her race, not that she was terminated based on her race.  She and Ms. Bostic were both terminated at the same time for failing the training program.

13. Mr. Mitchell, you stated in the Counselor's Report regarding Complainant not being given the opportunity for ADR:  "I do not believe that ADR would be appropriate, as I cannot offer any resolution due to lack of her successfully completing the academy training." Please respond.

A:  In the mediation process, there must be something to offer the aggrieved in resolution of the complaint; in this case, there was nothing that I could offer her due to the fact that she failed the training program.

14. Please list individual trainees who were terminated for failing the training program, within the past two years, August 1, 2014, through August 30, 2016, who were allowed reinstatement to the Training Academy.  Indicate for each:  name, date terminated, date reinstated, race and the reason for the reinstatement.

A:  Madeline Bostic,
Terminated:     5/10/2016
Reinstated:     10/30/2016
Race:        white
Reason:   reinstated as a result of ADR.

15. What is your understanding of agency policy and procedures for requests for training reinstatement?

A:  There is not an Agency policy handling requests for training reinstatement for Air Traffic Control students.  Class failure is considered final.

16. Complainant states that they [trainees] were advised that because they were not union members they could not file union grievances, nor participate in ADR.  Is this a fact?  What exactly were the trainees told?

A:  The students are not bargaining unit members; therefore, they are not eligible to file union grievances.  To my knowledge ADR is available to anyone.

I am not aware of what students are told in regards to this statement.

Initials

I have read this statement consisting of 5 pages, and I have made all the necessary changes, additions or corrections, and I have signed or initialed every page.

     I hereby declare under penalty of perjury that the foregoing statement is true, correct, and complete to the best of my knowledge and belief.

Signature: _____

Date: _March 31, 2017_

Signed before me on this

_3_ Day of _April_, 2017

_____
Signature of Witness

6

Initials _____

EXHIBIT 13

## Academy Tower Training Form - LOCAL CONTROL

| Name | RUTILA, HAROLD | Date 05/04/2016 | Scenario 1C | Class Number 99899 | Instructor Initials X5 | Lead Instructor SL |
|---|---|---|---|---|---|---|
| | **SUBJECT** | ☑TSS ☐T3D ☐TT | | ☐ Skill Check | | Occurrence ✓ |

| | | |
|---|---|---|
| 1 | **ENSURE SEPARATION** | |
| 2 | **ISSUE SAFETY ALERTS** | |
| 3 | **INITIATE REQUIRED COORDINATION** | |
| 4 | **APPLY CONTROL JUDGMENT** | |
| 5 | **APPLY PRIORITY OF DUTIES** | |
| 6 | **ESTABLISH EFFECTIVE TRAFFIC FLOW**<br>Has a good start on effective traffic flow | ✓ |
| 7 | **MAINTAIN AIRCRAFT IDENTITY** | |
| 8 | **USE APPROVED STRIPMARKING** | |
| 9 | **ISSUE REQUIRED CLEARANCES** | |
| 10 | **ADHERE TO LOAs/DIRECTIVES** | |
| 11 | **USE STANDARD PHRASEOLOGY**<br>Good phraseology - | ✓ |

Exhibit F-10
Page 23
of 27

## Academy Tower Training Form - LOCAL CONTROL

| Subj # | Additional Comments From Front |
|---|---|
|  |  |

Signature _John Stehlik_          Date 5/4/16

Employee Comments

This report has been
discussed with me.    Signature _Harold E. Little IV_    Date 05/04/2016

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

Exhibit F-10
Page 24
of 269

## Academy Tower Training Form – LOCAL CONTROL

| Name | | Date | Scenario | Class Number | Instructor Initials | Lead Instructor |
|---|---|---|---|---|---|---|
| RUTILA, HAROLD | | 05/05/2016 | 2 A | 99899 | RG | SL |
| **SUBJECT** | | ☒TSS ☐T3D ☐TT | | ☐ Skill Check | | Occurrence ✓ |
| 1 | ENSURE SEPARATION | | | | | |
| 2 | ISSUE SAFETY ALERTS | | | | | |
| 3 | INITIATE REQUIRED COORDINATION | | | | | |
| 4 | APPLY CONTROL JUDGMENT | | | | | |
| 5 | APPLY PRIORITY OF DUTIES<br>EXCELLENT | | | | | |
| 6 | ESTABLISH EFFECTIVE TRAFFIC FLOW | | | | | |
| 7 | MAINTAIN AIRCRAFT IDENTITY | | | | | |
| 8 | USE APPROVED STRIPMARKING | | | | | |
| 9 | ISSUE REQUIRED CLEARANCES | | | | | |
| 10 | ADHERE TO LOAs/DIRECTIVES | | | | | |
| 11 | USE STANDARD PHRASEOLOGY<br>EXCELLENT | | | | | |

Exhibit F-10
Page 27
of 201

## Academy Tower Training Form - LOCAL CONTROL

Subj #

### Additional Comments From Front

ERROR FREE RUN!

Signature ( Kirk Breathouse )                    Date  3.5-16

### Employee Comments

This report has been
discussed with me.    Signature Harold G. Rubble II        Date 05/05/2016

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Name | Date | Scenario | Class Number | Instructor Initials | Lead Instructor |
|------|------|----------|--------------|---------------------|-----------------|
| RUTILA, HAROLD | 05/10/2016 | 5B | 99899 | GC | SL |

| SUBJECT | ☒TSS  ☐T3D   ☐TT | ☐ Skill Check | Occurrence ✓ |
|---------|------------------|----------------|--------------|

| | | |
|---|---|---|
| 1 | **ENSURE SEPARATION** N88U, UAL23, LANDING, TWIN Cessna Departing INSufficient Separation. | |
| 2 | **ISSUE SAFETY ALERTS** | |
| 3 | **INITIATE REQUIRED COORDINATION** | |
| 4 | **APPLY CONTROL JUDGMENT** | |
| 5 | **APPLY PRIORITY OF DUTIES** | |
| 6 | **ESTABLISH EFFECTIVE TRAFFIC FLOW** | |
| 7 | **MAINTAIN AIRCRAFT IDENTITY** | |
| 8 | **USE APPROVED STRIPMARKING** | |
| 9 | **ISSUE REQUIRED CLEARANCES** | |
| 10 | **ADHERE TO LOAs/DIRECTIVES** | |
| 11 | **USE STANDARD PHRASEOLOGY** Good phraseology | ✓ |

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Subj # | Additional Comments From Front |
|--------|--------------------------------|
|        |                                |

Signature _(signature)_          Date  5-10-16

**Employee Comments**

This report has been
discussed with me.   Signature _Harold E. Riddle III_     Date  05/10/2016

Exhibit E-10
Page 31
of 309

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Name | | Date | Scenario | Class Number | Instructor Initials | Lead Instructor |
|------|---|------|----------|--------------|---------------------|-----------------|
| RUTILA, HAROLD | | 05/10/2016 | 5C | 99899 | LM | SL |
| **SUBJECT** | | ☑TSS ☐T3D ☐TT | | ☐ Skill Check | | Occurrence ✓ |

| | | |
|---|---|---|
| 1 | ENSURE SEPARATION | |
| 2 | ISSUE SAFETY ALERTS | |
| 3 | INITIATE REQUIRED COORDINATION | |
| 4 | APPLY CONTROL JUDGMENT | |
| 5 | APPLY PRIORITY OF DUTIES | |
| 6 | ESTABLISH EFFECTIVE TRAFFIC FLOW | |
| 7 | MAINTAIN AIRCRAFT IDENTITY | |
| 8 | USE APPROVED STRIPMARKING | |
| 9 | ISSUE REQUIRED CLEARANCES | |
| 10 | ADHERE TO LOAs/DIRECTIVES | |
| 11 | USE STANDARD PHRASEOLOGY | |

Exhibit F-10
Page 39
of 861

## Academy Tower Training Form - LOCAL CONTROL

Subj #

Additional Comments From Front

VERY NICE RUN

Signature _Josh McCrea_        Date _5-10-16_

Employee Comments

This report has been
discussed with me.    Signature _Harold E. Roberts IV_        Date _05/10/2016_

Exhibit _F-10_
Page _90_
of _807_

AMAFM-S0046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Name | RUTILA, HAROLD | Date 05/11/2016 | Scenario 6A | Class Number 99899 | Instructor Initials M+ | Lead Instructor SL |
|------|----------------|-----------------|-------------|--------------------|-----------------------|---------------------|
| | **SUBJECT** | ☒TSS ☐T3D ☐TT | | ☐ Skill Check | | Occurrence ✓ |

| | | |
|---|---|---|
| 1 | **ENSURE SEPARATION** | |
| 2 | **ISSUE SAFETY ALERTS** | |
| 3 | **INITIATE REQUIRED COORDINATION** | |
| 4 | **APPLY CONTROL JUDGMENT** Give yourself a little more room when landing RY34/ RY28R as to be able to ask they aircraft landing RY28R in more of a timely fashion to hull short of RY34 | ✓ ✓ |
| 5 | **APPLY PRIORITY OF DUTIES** Demonstrated good priorities. | |
| 6 | **ESTABLISH EFFECTIVE TRAFFIC FLOW** | |
| 7 | **MAINTAIN AIRCRAFT IDENTITY** | |
| 8 | **USE APPROVED STRIPMARKING** | |
| 9 | **ISSUE REQUIRED CLEARANCES** | |
| 10 | **ADHERE TO LOAs/DIRECTIVES** Demonstrated LLWAN procedures. | ✓ |
| 11 | **USE STANDARD PHRASEOLOGY** | |

Exhibit F-10
Page 41
of 207

## Academy Tower Training Form - LOCAL CONTROL

| Subj # | Additional Comments From Front |
|---|---|

Good run.

Signature _____ Date 5/11/16

**Employee Comments**

This report has been
discussed with me.    Signature _Harold E. Ruttle III_    Date 05/11/2016

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Name | RUTILA, HAROLD | Date 05/12/2016 | Scenario 7C | Class Number 99899 | Instructor Initials AG | Lead Instructor SL |
|---|---|---|---|---|---|---|
| | **SUBJECT** | ☑SS ☐T3D ☐TT | | ☐ Skill Check | | Occurrence ✓ |

| | | |
|---|---|---|
| 1 | **ENSURE SEPARATION** | |
| 2 | **ISSUE SAFETY ALERTS** | |
| 3 | **INITIATE REQUIRED COORDINATION** <br> OBSERVED CORRECT & TIMELY COORDINATION | ✓ |
| 4 | **APPLY CONTROL JUDGMENT** | |
| 5 | **APPLY PRIORITY OF DUTIES** | |
| 6 | **ESTABLISH EFFECTIVE TRAFFIC FLOW** <br> OBSERVED EFFICIENT MOVEMENT OF A/C DURING WINDSHIFT | ✓ |
| 7 | **MAINTAIN AIRCRAFT IDENTITY** | |
| 8 | **USE APPROVED STRIPMARKING** | |
| 9 | **ISSUE REQUIRED CLEARANCES** | |
| 10 | **ADHERE TO LOAs/DIRECTIVES** | |
| 11 | **USE STANDARD PHRASEOLOGY** <br> OBSERVED CORRECT PHRASEOLOGY | ✓ |

Exhibit F-10
Page 43
of 207

## Academy Tower Training Form - LOCAL CONTROL

| Subj # | Additional Comments From Front |
|---|---|

EXCELLEN LOCAL RUN

Signature _____    Date 5-12-16

Employee Comments

This report has been
discussed with me.   Signature Arnold E. Rettle IV    Date 05/12/2016

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Name | Date | Scenario | Class Number | Instructor Initials | Lead Instructor |
|------|------|----------|--------------|---------------------|-----------------|
| RUTILA, HAROLD | 05/18/2016 | 11C | 99899 | EJ | SL |

| SUBJECT | ☒SS  ☐T3D  ☐TT | ☐ Skill Check | Occurrence ✓ |
|---------|-----------------|---------------|--------------|

| | | |
|--|-----------------------------------|--|
| 1 | ENSURE SEPARATION | |
| 2 | ISSUE SAFETY ALERTS | |
| 3 | INITIATE REQUIRED COORDINATION | |
| 4 | APPLY CONTROL JUDGMENT | |
| 5 | APPLY PRIORITY OF DUTIES | |
| 6 | ESTABLISH EFFECTIVE TRAFFIC FLOW | |
| 7 | MAINTAIN AIRCRAFT IDENTITY | |
| 8 | USE APPROVED STRIPMARKING | |
| 9 | ISSUE REQUIRED CLEARANCES | |
| 10 | ADHERE TO LOAs/DIRECTIVES | |
| 11 | USE STANDARD PHRASEOLOGY | |

CONTINUE BUILD
SCANNING          ♪♪♪
PLANNING
WORKING   AND AIRPORT OUT

## Academy Tower Training Form – LOCAL CONTROL

| Subj # | Additional Comments From Front |
|---|---|
| | |

(BYRD)

John ~~Byrd~~ _[signature]_ 5/18/16

Signature_____ Date

Employee Comments

This report has been
discussed with me.   Signature _Harold E. Reubbs III_   Date _5/18/2016_

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4



Exhibit _F-10_
Page _67_
of _201_

## Academy Tower Training Form - LOCAL CONTROL

| Name | Date | Scenario | Class Number | Instructor Initials | Lead Instructor |
|------|------|----------|--------------|---------------------|-----------------|
| RUTILA, HAROLD | 05/16/2016 | 9 C | 99899 | AG | SL |

| SUBJECT | ☒TSS ☐T3D ☐TT | ☐ Skill Check | Occurrence ✓ |
|---------|---------------|---------------|--------------|

| | ENSURE SEPARATION | ✓ |
|---|---|---|
| 1 | Cleared N85JR R/W16 For.T/O when Ground Held Crossing bar. S.C. cancelled Crossing For L.C. | |
| 2 | ISSUE SAFETY ALERTS | |
| 3 | INITIATE REQUIRED COORDINATION | |
| 4 | APPLY CONTROL JUDGMENT | |
| 5 | APPLY PRIORITY OF DUTIES  WORK A/P out | ✓N |
| 6 | ESTABLISH EFFECTIVE TRAFFIC FLOW | |
| 7 | MAINTAIN AIRCRAFT IDENTITY | |
| 8 | USE APPROVED STRIPMARKING | |
| 9 | ISSUE REQUIRED CLEARANCES | |
| 10 | ADHERE TO LOAs/DIRECTIVES  AA481 (H) 2 R. Dept given wake. on MDH (H)Dept — Not Needed | ✓ |
| 11 | USE STANDARD PHRASEOLOGY  Instruction       R/W       Clearance  FLY R/W Hdg      R/W28L    Cleared For T/o | ✓ |

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.4

## Academy Tower Training Form - LOCAL CONTROL

| Subj # | Additional Comments From Front |
| --- | --- |

OVER-ALL A good Local RUN.

Don't Rush yourself. your voice pitch changes From normal to high!

Signature _____     Date 5-16-16

### Employee Comments

This report has been discussed with me.    Signature _____     Date 05/16/2016

AMAFM-50046-4 (Rev-0 10/21/2014) Course 50046, JO-3120.6

EXHIBIT 15

MAIL AND PACKAGE INFORMATION SYSTEMS
INNOVATIVE BUSINESS TECHNOLOGY

 **UNITED STATES**
**POSTAL SERVICE**

June 23, 2022

Via Email: h.rutila@gmail.com

Harold E. Rutila IV
14590 Longacre St
Detroit, MI 48227

Subject: FOIA Case No. 2022-FPRO-01548

Dear Mr. Rutila:

This letter is in response to your Freedom of Information Act (FOIA) request dated May 23, 2022, in which you seek access to Postal Service records. Specifically, you requested the following:

*A copy of the Certified Mail return receipts for the Certified Mail sent to me in November 2016 with tracking number 7012 3460 0001 7169 2762.*

The tracking information for item *7012 3460 0001 7169 2762* was not found in the Product Tracking and Reporting System. Please note that PTR retains item data for a period of time ranging from 120 days to 2 years depending on the product purchased. Tracking information for the item was also not found in the PTR Data Warehouse.

However, limited mail piece data is available in archives in some cases for signature items. The archive signature image data has been successfully retrieved for the item requested and is attached. A signature was collected on 11/29/2016 at 9:41 AM in Grand Prairie, TX 75052.

If you are not satisfied with the response to this request, you may file an administrative appeal within 90 days of the date of this response letter by writing to the General Counsel, U.S. Postal Service, 475 L'Enfant Plaza SW, Washington, DC 20260 or via email at FOIAAppeal@usps.gov. Your appeal must be postmarked or electronically transmitted within 90 days of the date of the response to your request. The letter of appeal should include, as applicable:

(1) A copy of the request, of any notification of denial or other action, and of any other related correspondence;
(2) The FOIA tracking number assigned to the request;
(3) A statement of the action, or failure to act, from which the appeal is taken;
(4) A statement identifying the specific redactions to responsive records that the requester is challenging;
(5) A statement of the relief sought; and
(6) A statement of the reasons why the requester believes the action or failure to act is erroneous.

For further assistance and to discuss any aspect of your request, you may contact the undersigned or FOIA Public Liaison listed below:

> PRIVACY AND RECORDS MANAGEMENT OFFICE
> U.S. POSTAL SERVICE
> 475 L'ENFANT PLAZA SW RM 1P830
> WASHINGTON, DC 20260-1101
> Phone: (202) 268-2608
> Fax: (202) 268-5353
> FOIA Public Liaison: Nancy Chavannes-Battle

Additionally, you may contact the Office of Government Information Services (OGIS) at the National Archives and Records Administration to inquire about the FOIA mediation services they offer. The contact information for OGIS is as follows: Office of Government Information Services, National Archives and Records Administration, 8601 Adelphi Road-OGIS, College Park, Maryland 20740-6001, e-mail at ogis@nara.gov; telephone at 202-741-5770; toll free at 1-877-684-6448; or facsimile at 202-741-5769.

Thank you for your interest in the Postal Service.

Sincerely,

Juliaann S. Hess
Director, Mail & Package Information Systems
Innovative Business Technology

EXHIBIT 16

Confidentiality Note: This e-mail, and any attachment to it, contains privileged and confidential information intended only for the use of the intended recipient. If the reader of this e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that reading it is strictly prohibited. If you have received this e-mail in error, please immediately return it to the sender and delete it from your system. Thank you.

On Mar 28, 2017, at 9:24 AM, Lacey, Eva (OST) <Eva.Lacey@dot.gov> wrote:

Good Morning Attorney Dama,

Thank you for the emails. Ms. Lewis is correct. You will note that my email simply informed that additional narrative may not be added to the accepted claim for investigation as the claim is consistent with the letter your client received accepting his complaint for investigation. Certainly he is not prohibited from including additional pertinent information in the body of his affidavit. However, the official accepted claim is the basis of the scope of the investigation. Also, when rendering a decision, the decision maker (DOT or EEOC) factors in the official issue accepted for investigation. You will note that Ms. Lewis did not state the accepted issue for investigation had been changed, but rather she mentioned that your client is provided with an opportunity to include concerns as essentially "Background" information in his affidavit. I hope this information clarifies the intent of my email of yesterday concerning the issue accepted for investigation.

Best regards,

Eva R. Lacey, EEO Specialist (Investigator)
U. S. Department of Transportation
Departmental Office of Civil Rights
Equal Employment Opportunity Complaints and
  Investigations Division
Case Management Branch
2300 E. Devon Ave., Suite 406
Des Plaines, IL 60018
Tel: (847) 294-8606
Fax: (847) 294-8605

This email and attachments are confidential information protected by attorney-client and/or attorney-work product and may be legally privileged. It is intended only for the use of the addressee and the privileges are not waived by virtue of this having been sent by email. If you are not the intended recipient, any disclosure, copying, distribution or any action taken or omitted to be taken in reliance on it, is prohibited and may be unlawful

**From:** Eric Dama [mailto:edama@robwiley.com]
**Sent:** Monday, March 27, 2017 4:44 PM
**To:** Lacey, Eva (OST)
**Subject:** Fwd: Request for Correction, Case 2016-26956-FAA-05

Ms. Lacey, below is the response Mr. Rutila received.

Sincerely,

**Eric Dama**
Trial Attorney
Rob Wiley, P.C.
2613 Thomas Ave.
Dallas, Texas 75204

Website   T: (214) 528-6500   F: (214) 528-6511
*Advocates for workers in employment and labor disputes.*
Confidentiality Note: This e-mail, and any attachment to it, contains privileged and
confidential information intended only for the use of the intended recipient. If the reader of this
e-mail is not the intended recipient, or the employee or agent responsible for delivering it to the
intended recipient, you are hereby notified that reading it is strictly prohibited. If you have
received this e-mail in error, please immediately return it to the sender and delete it from your
system. Thank you.

Begin forwarded message:

**From:** Harold R <h.rutila@gmail.com>
**Subject: Fwd: Request for Correction, Case 2016-26956-FAA-05**
**Date:** March 23, 2017 at 1:49:14 PM CDT
**To:** "edama@robwiley.com" <edama@robwiley.com>

---------- Forwarded message ----------
From: Harold R <h.rutila@gmail.com>
Date: Tue, Dec 6, 2016 at 2:17 PM
Subject: Re: Request for Correction, Case 2016-26956-FAA-05
To: Lewis, Jackie (OST) <Jackie.Lewis@dot.gov>

Ms. Lewis,

Thank you for the information. I appreciate it.

Sincerely,
Harold Rutila

On Tue, Dec 6, 2016 at 10:59 AM, Lewis, Jackie
(OST) <Jackie.Lewis@dot.gov> wrote:
Good Morning Sir,

This is in further reference to your email, dated December 3, 2016,
which you raised various concerns in reference to your accepted
claim. Please be advised that once you have been contacted by an
Investigator, and provided with an Affidavit, at that time you will be
afforded the opportunity to provide/present your concerns, which you
have indicated below, as "Background" information.

Again, thank you for contacting the Departmental Office of Civil Rights.

# EXHIBIT 17

 Gmail                             Harold Rutila <h.rutila@gmail.com

---

### Request for Correction, Case 2016-26956-FAA-05

**Harold R** <h.rutila@gmail.com>                                   Sat, Dec 3, 2016 at 10:16 PM
o: jackie.lewis@dot.gov

Good morning Ms. Lewis,

This is a request for correction regarding the accepted claim in Case No. 2016-26956-FAA-05. The accepted claim is currently worded as:

> Were you discriminated against because of your sex (male), when, throughout your training, you were subjected to less favorable evaluation standards than similarly situated females, culminating in the termination of your temporary appointment to the position of Air Traffic Control Specialist, effective May 25, 2016?

A portion of the submitted formal complaint highlights discrimination I experienced during the EEO informal complaint process following this accepted claim of discrimination. I am wondering if that claim will be accepted as part of this formal complaint as well as the claim that has already been accepted.

The FAA has claimed that Madeline Bostic, who was a similarly-situated female "training failure" or "washout" of the FAA Academy, entered into an informal EEO complaint. During the handling of Ms. Bostic's complaint, FAA management reportedly extended her ADR, resulting in a settlement that reportedly allowed her to be re-trained at the FAA Academy. FAA management did not accept my request for ADR, thereby constituting additional discrimination based on my sex. Information concerning Ms. Bostic's ADR extension was provided to me in a phone call by my EEO informal complaint counselor on September 6th, 2016.

Thank you for your consideration.

Sincerely,
Harold Rutila

EXHIBIT 18

 Gmail

Harold Rutila <h.rutila@gmail.com>

---

Request for Correction, Case 2016-26956-FAA-05

Lewis, Jackie (OST) <Jackie.Lewis@dot.gov>                    Mon, Dec 5, 2016 at 11:44 AM
To: Harold R <h.rutila@gmail.com>
Cc: "Sommers, Judy <FAA>" <judy.sommers@faa.dot.gov>

Good Morning Sir,

Your concerns in regards to your Acceptance Letter, dated November 22, 2016, are greatly appreciated. At this time, the matter is being reviewed by management, and you should receive a response shortly.

Thank you for your patience.

*Ms. Jackie Lewis*

**EEO Specialist**

**Department of Transportation**

**Departmental Office of Civil Rights**

**Case Management Branch**

**EEO Complaints & Investigations Division**

**1200 New Jersey Avenue SE, W78-111**

**Washington, DC 20590**

**Phone: 202-366-1914; Fax: 202-366-5575**

[Quoted text hidden]

 Gmail

Harold Rutila <h.rutila@gmail.com

---

Request for Correction, Case 2016-26956-FAA-05

Lewis, Jackie (OST) <Jackie.Lewis@dot.gov>                              Tue, Dec 6, 2016 at 11:59 AM
To: Harold R <h.rutila@gmail.com>
Cc: "Sommers, Judy <FAA>" <judy.sommers@faa.dot.gov>

Good Morning Sir,


This is in further reference to your email, dated December 3, 2016, which you raised various concerns in reference to your
accepted claim.  Please be advised that once you have been contacted by an Investigator, and provided with an Affidavit, at that
time you will be afforded the opportunity to provide/present your concerns, which you have indicated below, as "Background"
information.


Again, thank you for contacting the Departmental Office of Civil Rights.

[Quoted text hidden]

Good morning Ms. Lewis,

[Quoted text hidden]

# EXHIBIT 19

**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Oklahoma City Area Office**

| | | |
|---|---|---|
| **HAROLD E. RUTILA, IV** | § | **EEOC No. 560-2018-00133X** |
| | § | |
| **Complainant,** | § | **Agency No. 2017-26956-FAA-05** |
| | § | |
| **-v-** | § | |
| | § | |
| **ELAINE L. CHO, SECRETARY,** | § | **Date: May 29, 2019** |
| **DEPARTMENT OF TRANSPORTATION,** | § | |
| **FAA,** | § | |
| | § | |
| **Agency.** | § | |

## AGENCY'S OBJECTIONS AND RESPONSES TO COMPLAINANT'S DISCOVERY, INCLUDING REQUESTS FOR PRODUCTION AND INTERROGATORIES

### OBJECTIONS AND RESPONSES TO COMPLAINANT'S REQUESTS FOR PRODUCTION

1.  All communications concerning the factual allegations or claims at issue in this matter among or between:

    a.  The Complainant and the Agency;

    b.  The Complainant's manager(s), and/or supervisor(s), and/or instructor(s), evaluator(s), and/or the Agency's human resources representative(s) or management official(s).

**Response to Request for Production #1:**  Although there are some emails responsive to these requests throughout the ROI, the agency has produced all emails known to it at this writing responsive to the two requests encompassed in Request for Production #1.  The Agency has not produced emails related to Complainants cases in other forums.  Respondent further avers that to the extent Complainant would characterize any other document(s) produced as responsive to this requests, Complainant should consider that or those documents as supplementing this request.

2.  All communications concerning the Complainant's EEO activity among or between the Complainant, Complainant's manager(s), and/or supervisor(s), and/or

instructor(s), evaluator(s), and/or the Agency's human resources representative(s) or management official(s).

**Response to Request for Production #2:**   Although there are some emails responsive to these requests through out the ROI, the agency has produced all emails known to it at this writing responsive to this Request for Production.  The Agency has not produced emails related to Complainants cases in other forums, or all emails related to his basic "on-boarding" at the agency, as those are not relevant to any issue in the case at bar.  Respondent further avers that to the extent Complainant would characterize any other document(s) produced as responsive to this requests, Complainant should consider that or those documents as supplementing this request.

3.    The Complainant's personnel file, including performance evaluations, training

records, and formal discipline.

**Response to Request for Production #3:**    Respondent has produced Complainant's Official Personnel File.  That file does not include Complainant's training records; however, those have been produced in the Report of Investigation ("ROI"), both in Tab F1 (added by Complainant) and at Tabs F9 and F10.  Respondent avers that there are no records of annual performance reviews or formal discipline, as Complainant was only employed by Respondent agency for approximately 3 months.

4.    Madeline Bostic's personnel file, including performance evaluations, training

records, formal discipline, and all documents related to the termination, failing,

retesting, and rehiring of Madeline Bostic.

**Response to Request for Production #4:**   Respondent objects to this request as it seeks information which is irrelevant to the case at bar, as well as disproportionate to the needs of discovery in the case at bar.  While Ms. Bostic has been named as a comparator in the case at bar, there is nothing relevant to that comparison not already in the ROI for this case.  The agency objects to providing any information in Ms. Bostic's personnel file or otherwise, beyond the information that she was terminated as was Complainant, but reinstated/ "recycled" in training as the result of a settlement agreement.  Notwithstanding and without waiving its objections, the Agency has produced the redacted settlement agreement between Ms. Bostic and respondent Agency.

5.    Documents relied upon to make the employment decision(s) at issue in this matter.

**Response to Request for Production #5:**  All documents known by Respondent to be responsive to this request are in the ROI for the case at bar or have been produced in response to these requests

process, and is improper in the matter before this Administrative Judge. Respondent does not have more information about the process than is recorded and included in the ROI which is equally available to Complainant as to Defendant.

Dated this 29th day of May, 2019

       Respectfully Submitted

       Elizabeth Glass, Esq.
       Agency Representative
       Federal Aviation Administration
       Southwest Regional Office 6N-300
       10101 Hillwood Parkway
       Fort Worth, Texas 76177
       Telephone number: 817-222-5082
       Facsimile number : 817-222-5099
       Elizabeth.glass@faa.gov

## CERTIFICATE OF SERVICE

I certify that on this 29th day of May, 2019, I sent the foregoing Respondent's Responses to Complainant's Discovery Requests, with attachments by overnight mail to the individuals listed below:

Attorney for Complainant
Eric P. Dama
Law Office of Rob Wiley, PC.
2613 Thomas Avenue
Dallas, Texas 75204
Telephone: (214) 528-6500
Facsimile: (214) 528-6511
edama@robwiley.com
Via overnight mail

and

EXHIBIT 20



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**Oklahoma City Area Office**

Michelle M. Robertson
Administrative Judge
215 Dean A. McGee Avenue, Suite 524
Oklahoma City, OK 73102
Oklahoma City Direct Dial: (405) 231-5843
TTY (405) 231-5745
FAX (405) 231-4140

| | |
|---|---|
| HAROLD E. RUTILA, IV, | ) EEOC No. 560-2018-00133X |
| | ) |
| Complainant, | ) Agency No. 2017-26956-FAA-05 |
| | ) |
| v. | ) |
| | ) |
| ELAINE L. CHAO, SECRETARY, | ) Date: July 10, 2020 |
| DEPARTMENT OF TRANSPORTATION, | ) |
| FAA, | ) |
| | ) |
| Agency. | ) |

## DECISION AND ENTRY OF JUDGMENT

### I. INTRODUCTION

The findings and conclusions in this matter are being issued without a hearing. Pending before the Commission is the Agency's motion for summary judgment to which Complainant submitted a response. The issues have been briefed by both parties. Jurisdiction to conduct hearings on equal employment opportunity complaints is found in the EEOC regulations at 29 C.F.R. § 1614.109. EEOC regulation 29 C.F.R. § 1614.109 (g)(1) provides that an Administrative Judge may issue an order without a hearing upon motion of a party. Following review of the parties' respective arguments as well as the investigative file, the undersigned determined that this matter may be decided without the necessity of conducting a hearing.

### II. PROCEDURAL BACKGROUND

EEOC received Complainant's hearing request on September 11, 2017. The Complainant's case was transferred to the Oklahoma Area Office and assigned to the undersigned Administrative Judge on April 23, 2019. On April 23, 2019, the undersigned issued an Acknowledgment and Order Regarding the Hearings Process that afforded the parties the opportunity to engage in discovery and set other deadlines. The Agency timely filed its Motion for Summary Judgment, the Complainant submitted his Response and Objection, and the Agency filed its Reply.

### III. ISSUE

Was Complainant subjected to discrimination because of his sex (male) when, throughout his training as an Air Traffic Control Specialist Trainee (ATCS) by the U.S. Department of Transportation (DOT) Federal Aviation Agency (FAA) Academy, he was subjected to less favorable evaluation standards than similarly situated females, culminating in the termination of

his temporary appointment to the position of Air Traffic Control Specialist, effective May 25, 2016.[1]

## IV. FINDINGS AND ANALYSIS

### A. STANDARD FOR SUMMARY JUDGMENT

Summary judgment is appropriate where the Administrative Judge determines that there is no genuine issue as to any material fact and judgment should be rendered as a matter of law as governed by the applicable substantive law. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Gaskin v. U.S. Postal Serv.*, EEOC Appeal No. 01904286 (1991). In order to avoid summary judgment, the non-moving party must produce admissible factual evidence sufficient to demonstrate the existence of a genuine issue of material fact requiring resolution by the finder of fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). The "summary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.'" *Id.* at 327, [internal citations omitted].

In ruling on a motion for summary judgment, the judge must determine whether, "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to summary judgment as a matter of law." *Anderson*, *supra* at 247. Only facts which may affect the outcome of a case are material. *Id.* at 248. The "mere existence of a scintilla of evidence in support of the [complainant's] position will be insufficient." *Id.* at 252. *See also, Nogas v. United States Postal Serv.*, EEOC Appeal No. 01994718 (Jan. 30, 2002). In order to demonstrate the existence of a genuine issue for hearing, a party must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Elec. Indus. Co. v. Zenith Radio*, 475 U.S. 574, 586 (1986).

Summary judgment is mandated against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at hearing. *Celotex Corp. v. Catrett*, 477 U.S. at 322. In ruling on a motion for summary judgment, the evidence and all reasonable inferences to be drawn therefrom are viewed in a light most favorable to the non-moving party. *Hutson v. McDonnell Douglas Corp.*, 63 F.3d 771, 775 (8th Cir. 1995). The complainant in an employment discrimination matter must produce, "sufficient evidence to raise a genuine issue of fact as to whether the [agency's] proffered reason(s) was (were) not its true reason(s) for the challenged employment action" in order to survive a motion for summary judgment. *See, Sheridan v. E.I. DuPont de Nemours & Co.*, 100 F.3d 1061, 1067 (3rd Cir. 1996) (*en banc*).

---

[1]    The claim is set forth in the Acceptance Letter issued by the Agency and dated November 22, 2016. (Report of Investigation, hereinafter ROI, p. 73.) Complainant was given five days in which to submit any objections to the manner in which his claim was framed, which he did not do. Any further objections are deemed waived. *See, Robinson v. Peace Corps.*, EEOC Appeal No. 05940710 (May 2, 1995); and *Small v. United States Postal Serv.*, EEOC Appeal No. 05980289 (July 16, 1999) (Complainant failed to file a motion to have an issue reviewed or amended in the present forum, therefore it is deemed abandoned.)

the matter, the complainant may appeal to the Commission for a determination of whether the agency has complied with the terms of its final action. The complainant may file such an appeal 35 days after serving the agency with the allegations of non-compliance, but must file an appeal within 30 days of receiving the agency's determination. A copy of the appeal must be served on the agency, and the agency may submit a response to the Commission within 30 days of receiving the notice of appeal.

      It is so ORDERED.         For the Commission:

Michelle M. Robertson
Administrative Judge